DECISION AND JOURNAL ENTRY
{¶ 1} Appellant, Marika Myers, appeals from a decision of the Summit County Court of Common Pleas, Juvenile Division, that terminated her parental rights and placed her three minor children in the permanent custody of Summit County Children Services Board ("CSB"). This Court affirms.
 I. {¶ 2} Myers is the natural mother of R.C., born May 13, 1993, C.C., born March 8, 2000, and N.C., born September 15, 2005. The fathers of the children are not parties to this appeal.
 {¶ 3} R.C. and C.C. were removed from the home pursuant to Juv. R. 6 on May 25, 2005, after a drug arrest of two adults who had the children in their car, which led to subsequent drug charges against Myers and the father of the children ("Father"). According to the *Page 2 
allegations of CSB, R.C. and C.C. had been exposed to methamphetamine production and the older boy had indicated an awareness of that activity and that he had been negatively impacted by it.
 {¶ 4} The family's reunification plan focused on remedying the parents' drug and alcohol problems. CSB also had concerns about domestic violence in the home, so Father was required to attend anger management classes and both parents were required to attend couples counseling. N.C. was born during the pendency of this case and was removed from the home shortly after his birth.
 {¶ 5} It was not discovered until later that N.C. had a different father. At the time paternity testing was done, N.C.'s father was incarcerated. Because the father of N.C. has had no involvement with his child and is not at issue in this appeal, references in this opinion to Father are to the father of R.C. and C.C, and references to the parents are to Myers and Father only.
 {¶ 6} During March, 2007, because Myers and Father had secured stable housing, had tested negative for drugs and alcohol, and had been addressing their issues with domestic violence, all three children were returned to the home under an order of protective supervision. Shortly after the children were returned, Myers left the home for approximately six days and her whereabouts were unknown. Within a few weeks, when the CSB caseworker came for an unannounced visit, she discovered that the family had moved. The parents never informed CSB, nor could CSB reach them by phone. It was more than three weeks later that the caseworker was able to locate the family. At about the same time, CSB discovered that N.C. had a serious diaper rash that eventually developed into a staph infection because the parents did not get the necessary medication to treat the rash. *Page 3 
 {¶ 7} On May 2, 2007, the former guardian ad litem moved the court to return the children to the temporary custody of CSB. She asserted that the parents had moved without informing CSB and that the parents were not complying with the court order that they submit to regular drug screens. She also asserted that Myers was continually exposing N.C. to cigarette smoke, which irritated his asthma and had required hospitalizations in the past. The trial court again ordered that the children be removed from the home and returned to the temporary custody of CSB.
 {¶ 8} On May 16, 2007, CSB moved for permanent custody of all three children. Following a hearing on the motion, the trial court terminated parental rights and placed R.C., C.C., and N.C. in the permanent custody of CSB. Myers appeals and raises one assignment of error.
 II. ASSIGNMENT OF ERROR "THE TRIAL COURT'S DECISION GRANTING PERMANENT CUSTODY IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 9} Myers contends that the trial court's decision to terminate her parental rights and place her three minor children in the permanent custody of CSB was not supported by the evidence. Before a juvenile court can terminate parental rights and award to a proper moving agency permanent custody of a child, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of the prior 22 months, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). See *Page 4 
R.C. 2151.414(B)(1) and 2151.414(B)(2); see, also, In re William S.
(1996), 75 Ohio St.3d 95, 99.
 {¶ 10} The trial court found that the first prong of the permanent custody test had been satisfied because all three children had been in the temporary custody of CSB for more than twelve of the prior twenty-two months and Myers does not contest that finding. Myers challenges only the trial court's finding that permanent custody was in the best interests of R.C, C.C., and N.C.
 {¶ 11} When determining whether a grant of permanent custody is in the child's best interest, the juvenile court must consider the following factors:
 "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999; [and]
"(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency[.]" R.C. 2151.414(D)(1)-(4).[1]
 {¶ 12} Although the fathers of the children have not appealed, Myers argues throughout her brief on behalf of Father. CSB maintains that Myers has no standing to assert the parental rights of Father, but this Court has held otherwise. See In re A.S., 9th Dist. No. 23456,2007-Ohio-2195, at ¶ 10. When both parents' rights have been involuntarily terminated pursuant to *Page 5 
R.C. 2151.414, either parent has standing to assert the other parent's rights due to the impact on her own residual parental rights. Id.
 {¶ 13} Although Myers may assert the rights of Father, this Court will not address his parenting ability in isolation, particularly because these parents had lived together with the children prior to their removal and during their brief return to the home. This Court will address whether termination of both parents' rights was in the best interest of these children.
 {¶ 14} The parents' interaction with the children was initially positive. The evidence revealed that Myers and Father visited the children and that visits went fairly well and eventually progressed to overnight and weekend home visits. Because both parents appeared to be remedying the problems that led to the children's removal, on March 13, 2007, the trial court ordered that the three boys be returned to the parents' home under an order of protective supervision. Among the critical factors that had influenced the trial court to return the children were that the parents had stable housing and employment and were submitting regular negative drug screens.
 {¶ 15} The children had lived away from their parents for nearly two years and had lived in several different foster homes. Rather than the children finally achieving stability by returning home, however, the parents almost immediately uprooted them and moved again. A few weeks after the children's return home, the caseworker discovered that they had moved from their residence when she made an unannounced visit to the home. For "well over three weeks" the caseworker could not reach the parents through any of the contact information that they had given CSB. She was finally able to locate the family through contact information she obtained from R.C.'s school. *Page 6 
 {¶ 16} After the caseworker was able to locate the family, she discovered that N.C. had a severe diaper rash that, because the parents did not obtain the necessary medication, developed into a staph infection. The parents had also stopped taking R.C. to counseling that he had been undergoing for anger issues and they were no longer submitting regular urine samples for drug screening. During what should have been a long-awaited reunion period with her children, Myers also left the home for approximately six days and her whereabouts were unknown even to Father.
 {¶ 17} While Myers was with the children in her home, she continued to expose them to her cigarette smoking despite warnings from CSB about the health hazards and even after her smoking had caused N.C. to have an asthma attack and had caused a burn on C.C.'s face when he apparently walked into a lit cigarette in Myers's hand. The caseworker and others continually reminded Myers that she could not smoke around N.C. Rather than agreeing to modify her behavior to protect her child's health, however, Myers responded that she had smoked around the two older children and that N.C. would just have to get used to it.
 {¶ 18} The children's interaction with their current foster families, on the other hand, was stable and positive. The two older boys were placed in one home and N.C. was placed in another. All three were doing well in their current placements and the foster parents testified that they would like to adopt them.
 {¶ 19} The two older children, R.C. and C.C., expressed their desire to remain in their current foster home, where they both resided together. The oldest child, R.C, explained to the guardian ad litem that he was tired of moving from place to place and that he wanted a permanent home, or a place "to put my clothes," as he put it. R.C. also expressed anger toward *Page 7 
his parents and their inability to resolve their parenting problems during the two years of this case plan.
 {¶ 20} The guardian ad litem spoke on behalf of N.C., who was only two years old at the time of the hearing. She opined that N.C., like the two older boys, had moved around too many times during his short life and that permanent custody was in his best interest, as it was for the two older boys. The guardian emphasized that when the children were returned to the home under an order of protective supervision and the parents moved without notifying CSB, the parents had demonstrated a lack of responsibility for their children.
 {¶ 21} There was no evidence about the custodial history of the children prior to this case, other than that the two older children lived with their parents and there had been prior referrals to CSB. The custodial history of the children during this case included more than two years in CSB custody. The caseworker testified that this was the longest case that she had worked on in her four years as a caseworker. As this Court emphasized in In re Smith (Jan. 2, 2002), 9th Dist. No. 20711, however, "the time period in and of itself cannot be held against the parent without considering the reasons for it and the implications that it had on [these children]."
 {¶ 22} During this lengthy period of time, the children were returned to the home briefly under an order of protective supervision because Myers and Father had convinced the court that they had obtained stable housing, and that they had their problems with substance abuse and domestic violence under control. Shortly after the children were returned home, however, the parents stopped cooperating with CSB. It appeared that the parents acted in the best interests of their children and complied with case plan requirements just long enough to get them back.
 {¶ 23} During their time in and out of CSB custody, the children were moved from place to place in an effort to find suitable placements. Although some of the moves were due to *Page 8 
circumstances beyond the control of the parents or CSB, each child had suffered emotional, developmental, and academic set-backs due to their ongoing lack of a permanent home. All three children had found stability in their current foster placements and their foster parents planned to adopt them.
 {¶ 24} There was substantial evidence before the trial court that each of these children was in need of a permanent placement and that their parents could not provide such a placement for them. Myers had failed to adequately address her drug problem and the father of N.C. was incarcerated at the time of the hearing. Although Myers suggests that Father would have been able to provide a stable home for the children, he had refused to provide CSB information about the other adult living in his home so CSB had been unable to fully investigate the suitability of his home. It was also unclear how many other children were living in Father's home.
 {¶ 25} Although N.C.'s paternal grandmother and the foster parents of R.C. and C.C. had moved for legal custody of N.C, there was evidence before the court that another relocation for N.C. would not be in his best interest. CSB had considered removing N.C. from his current foster home so that he could be placed in the same foster home as his brothers, but there was concern at the agency that another move would be detrimental to N.C. By the age of 20 months old, N.C. had changed homes 5 different times.
 {¶ 26} CSB sent N.C. to a professional clinical counselor at the Attachment and Bonding Center of Ohio. The counselor testified that N.C. had experienced far too many moves in his short life and that multiple moves cause significant damage to young children. She explained that N.C. had difficulty attaching to adults, he was full of anxiety and that he exhibited significant developmental delays. She opined that N.C. should stay with his current foster family because he had been there for an ongoing period and was making progress, the foster parents are *Page 9 
committed to him, and that another move may lead to a further loss of development. The foster mother testified that she and her husband want to adopt N.C. and they plan to keep him in the same home and preschool. She further explained that N.C. is becoming less apprehensive and is more willing to accept and give affection. The trial court found that it would not be in N.C.'s best interest to be relocated to another home.
 {¶ 27} There was ample evidence before the trial court to support its conclusion that permanent custody was in the best interests of R.C., C.C., and N.C. The assignment of error is overruled.
 III. {¶ 28} The assignment of error is overruled and the judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App. R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App. R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App. R. 30. *Page 10 
Costs taxed to Appellant.
WHITMORE, J., DICKINSON, J. CONCUR
[1] The factor set forth in R.C. 2151.414(D)(5) is not relevant in this case. *Page 1