**[Cite as *In re B.H.*, 2024-Ohio-423.]**

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| IN RE: B.H. AND S.G. | : | APPEAL NOS. C-230530 |
| | | C-230532 |
| | : | TRIAL NO. F20-95Z |
| | : | |
| | : | *O P I N I O N.* |

Appeals From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: February 7, 2024

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Patsy Bradbury,* Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Donita Parrish,* Attorney for the Guardian Ad Litem for the children,

*Alana Van Gundy,* for Appellant Mother,

*Jeffrey J. Cutcher*, for Appellant Father.

**Bock, Presiding Judge.**

**{¶1}** K.S. ("mother") appeals the juvenile court's judgment granting permanent custody of her children, S.G. and B.H., to the Hamilton County Department of Job and Family Services ("JFS"). Mother asserts that the court's decision was not supported by sufficient evidence and was against the manifest weight of the evidence. Mother further argues that the record does not show that the guardian ad litem ("GAL") observed the children with mother in violation of Sup.R. 48.

**{¶2}** Although B.H.'s[1] alleged father ("father") did not have significant involvement with B.H. and did not engage in any case-plan services, he has appealed in support of mother's arguments. Because he does not make any arguments specific to the termination of his parental rights, we address mother's and father's arguments together.

## I. Relevant Facts and Procedural History

### A. Pretrial stipulations, services, and status

**{¶3}** In January and February 2021, JFS filed a complaint and an amended complaint with the Hamilton County Juvenile Court, alleging that S.G. and B.H. were neglected, abused, and dependent.

### Mother and father's stipulations

**{¶4}** In April 2021, JFS dismissed and refiled its complaint. During a July 2021 adjudicatory hearing, mother and father stipulated to numerous facts alleged in JFS's April 2021 complaint:

- In October 2019, maternal grandmother, who lived with mother and the children, overdosed in the home while the children were

---

[1] S.G.'s father did not participate in the proceedings.

present. The two oldest children (who are not the subject of this appeal) reported that maternal grandmother took Xanax and Ativan, displayed out-of-control behaviors, urinated on herself, got into an altercation with mother, and later fell and hit her head. The children had to call 911 because mother was asleep. Maternal grandmother later died from injuries cause by the fall.

- In text messages, mother and maternal grandmother had discussed obtaining drugs, selling "food stamps," and other means to make money.

- In June 2020, JFS received a report of substance abuse in the home, mother's "out of control behavior," mother's untreated mental health, and mother's failure to meet her children's basic needs. The children reported to JFS seeing needles and illicit substances around the home and being used by people in the home. Mother denied substance use but admitted that her paramour, B.W., used drugs in the home. As a result, JFS implemented a safety plan with maternal grandfather.

- In July 2020, mother denied JFS access to her home and the children as required by the safety plan. She failed to respond to JFS's attempts to contact her until an October 2020 telephone call, when she admitted to her failure to address her anger and mental-health issues. She continued to refuse JFS access to the home.

- In November 2020, the court granted interim custody of the two older children, A.G. and L.G., to a relative. Mother failed to comply with

3

court orders to provide the children's personal belongings and submit to a hair-follicle toxicology test.

• After the November 2020 custody hearing, JFS interviewed A.G. and L.G, who reported that there was often no food in the home and they had witnessed domestic violence between mother B.W. They told JFS that they had witnessed drug use and drug paraphernalia in the home, drug trafficking by mother, and needles and blood in the bathroom. They had seen B.W. under the influence of substances, exhibit bizarre behaviors, and "nod[] off." The children were able to describe what different drugs look like, how drugs are injected, and the marks left by an injection, which they had seen on B.W.'s arm. They had observed baggies of white powder and marijuana in the home. L.G. and A.G. were responsible for cooking, cleaning, bathing, changing, and supervising the younger three children because mother mostly stayed in her room and slept.

• JFS received reports that the family home had been robbed multiple times, with the children present, by people that mother knew. Mother had obtained two guns.

• JFS discovered that S.G. had a speech delay caused by an untreated cleft palate.

• Father had a significant criminal history involving drugs and theft charges. He had an open warrant for his arrest.

• After the court granted JFS interim custody of the children in January 2021, JFS workers who retrieved the children from mother's

4

home observed that mother had a black eye. JFS discovered that mother had posted pictures of herself on social media showing physical injuries, including a black eye.

## Additional allegations

{¶5} Mother and Father did not stipulate to other facts alleged in the April 2021 complaint:

- JFS alleged that in January 2020, it received a report that police had responded to the home after mother shot B.W. during a domestic-violence altercation while the children were present. JFS alleged that B.W. frequently visited the home, had pleaded guilty to drug charges, and had multiple active warrants. Mother reported that she made attempts to keep B.W. away from the home, but he continued to return.

- S.G. and B.H. allegedly had never been enrolled in school. Mother had previously been charged with failing to send L.G. to school.

## Case-plan participation and GAL involvement

{¶6} By March 2021, the GAL had made three unsuccessful attempts to contact mother. She had conducted virtual meetings with B.H. and S.G. twice in February 2021 and had face-to-face contact with the children in March 2021 at their foster-home placement. JFS interviewed father in February 2021.

{¶7} Mother's initial case plan stated that mother spent her money on drugs and other unnecessary items over providing food and necessities for her children, permitted unsafe people access to the home, and left the children either unattended or with these unsafe people. The children were fearful of her due to her outbursts. Mother had lost her housing. But mother believed there were no safety concerns and saw no

5

need for JFS's involvement. The case plan required mother to engage in services, such as a diagnostic assessment of functioning ("DAF"), domestic-violence and parenting classes, and drug screens. She was also required to visit the children regularly.

{¶8} In April 2021, mother and father agreed with an interim-custody award to JFS. The court adjudicated the children dependent. In addition to the stipulated facts, the trial court found that 1) mother had a history with JFS with concerns about her mental health, substance abuse, and inability to meet the children's basic needs, including stable housing and food; 2) mother and grandmother had texted about a lack of food; 3) B.H. and S.G. were not, and never had been, enrolled in school, causing significant delays; and 4) mother either shot or attempted to shoot B.W. in the home with the children present.

{¶9} By July 2021, mother was not participating in any services, was staying with different friends, and had no stable income. Mother had not consistently visited the children, causing the Family Nurturing Center ("FNC") to cancel mother's visitation.

{¶10} In December 2021, mother had begun to make some progress in completing case-plan services. She had completed a visitation intake and was "somewhat engaged in her parenting classes." Reunification remained the goal. The magistrate granted JFS's first motion to extend temporary custody of the children and granted mother supervised visitation.

## JFS sought permanent custody

{¶11} Approximately 18 months after removing the children from mother's care, JFS sought permanent custody of the children.

6

{¶12} Though JFS had referred mother for a DAF, substance-abuse treatment, drug screens, and parenting classes, she failed to engage in substance-abuse and mental-health treatment and parenting classes. Mother lacked stable housing and reportedly was seeking employment. Mother's February 2022 drug screen was positive for fentanyl, marijuana, cocaine, methamphetamine, and opiates. Mother's visitation was cancelled again due to her lack of attendance. Mother had pending felony drug and weapons charges. Father had abandoned B.H.

**The children's counselors recommended no visits with mother**

{¶13} A December 2022 letter from B.H.'s counselor reported that B.H. had been residing with his foster parents for two years and expressed that he wanted to be adopted by them. Mother had failed to appear for most visits, only visiting B.H. eight times over ten months. B.H. experienced vomiting and diarrhea within 24 hours of the visit each time he saw mother, with four instances resulting in a fever of more than 101 degrees. B.H.'s counselor concluded that "somatic symptoms of stress were extreme and obviously directly correlated with the visits with his mother." Further, mother's visits "caused posttraumatic stress that is too much for a little boy to handle, and it manifested in physical illness that disrupted his school attendance, holiday, and other activities." The counselor concluded that B.H.'s visits with mother were "detrimental to [B.H.'s] mental and physical health, and that restarting them would set him back significantly in his emotional and academic progress."

{¶14} A December 2022 letter from S.G.'s counselor stated that she had "work[ed] therapeutically with S.G. long enough to have seen her through four foster and kinship placements." The counselor was against visitation with mother because "mother has demonstrated a grossly inconsistent visit pattern in the past and this

places a great deal of unnecessary psychological burden on 8 year old [S.G.] including feelings of abandonment, neglect, shame and self-blame." The counselor added that mother had not made any "noted psychological changes" and continued to "express that [S.G.] was, in fact, safe in her care." She further opined that mother had "continued in the same lifestyle choices as when [S.G.] was originally taken into JFS custody" due to her failure to take accountability for the reasons behind the removal of her children. S.G.'s counselor recommended suspending mother's visits until mother could "show and verbalize significant emotional change and responsibility for her negative impact on [S.G.'s] emotional and physical wellbeing."

### B. **Hearing on the permanent-custody motion**

{¶15} The court held a January 2023 hearing on JFS's permanent-custody motion. Although Father was not present, he was represented by counsel.

### **JFS caseworkers' testimony**

{¶16} JFS caseworkers testified that mother had failed to engage in required services, despite the agency's referrals. Although JFS referred mother to complete a DAF, she failed to do so, which prevented JFS from making any treatment recommendations. Mother appeared at three drug screens and was positive for "a multitude of things" at the first two. Mother left one JFS caseworker "incoherent" messages. But a 2023 drug screen came back as negative for illicit substances.

{¶17} Mother did not see the children for months at a time, had lost her visitation time at FNC due to persistently being late or not attending, and failed to take advantage of setting up supervised visits at the agency. Mother's last visit with the children had occurred in either February or March of 2022. Mother failed to maintain stable housing. JFS caseworkers testified that mother failed to meet S.G.'s medical

8

needs throughout the case. Further, a caseworker testified about B.H.'s trauma due to dangers of drug use in the home, break-ins, and mother's shooting B.W. while the children were present.

{¶18}  By the January 2023 trial, mother had only completed about two of the approximately 12 parenting classes. Mother was living in a sober-living home and was working full-time. But a caseworker testified that mother would have been able to "dive deeper" into her domestic-violence classes had she completed the YWCA domestic-violence assessment.

{¶19}  When asked whether mother had alleviated any concerns that had caused JFS's removing the children from her care, a JFS caseworker responded that "she's in parenting classes, but that doesn't indicate any behavioral change." Mother's sober-living home was not considered stable housing because the children could not reside there with her full-time.

### S.G.'s counselor testified about her trauma

{¶20}  S.G.'s counselor testified that S.G.'s diagnoses typically present in youth due to "[t]raumatic experiences, violence, domestic violence, a variety of experiences that create trauma in the child's life." The counselor stated that S.G. had shared "many traumatic experiences that have occurred with" mother and "frightening" stories. The counselor noted that S.G.'s "acting out" was a "direct consequence of her trauma."

### Mother testified that she was making progress

{¶21}  Mother testified that she did not complete a DAF because a case manager had told her it was not necessary "right before [she] went to jail" and again at her sober-living home, and there was already one on file. She asserted that she had

not previously completed services because she did not receive the referrals, or when she did, they were given to her slowly over time to avoid overwhelming her.

{¶22} Mother acknowledged that her children had witnessed events that were detrimental to their well-being and expressed remorse for what her children had experienced. She admitted that she avoided communication with JFS, failed to attend drug screens, visited inconsistently, and lacked responsibility. Mother stated that she had been sober since August 28, 2022.

{¶23} Mother stated that her visitation at FNC had been terminated four times due to poor time management, which she had remedied by completing a time-management class. Mother asserted that she had attended four parenting classes since her release from jail, but she could not complete the remainder as it required her to be able to visit with the children and her visits had been revoked. As she could not keep the children overnight at the sober-living home for more than two nights, mother suggested that the children could stay with maternal grandfather for the remainder of each week if she were granted custody.

{¶24} Mother conceded that she was not fully ready to take the children on by herself at the time of trial. But she testified that she was attending domestic-violence support groups. She stated that she has been attending mental-health treatment for five years, worked full-time, voluntarily took a time-management class to help with her issues with being late, and asserted that she had an entire medical team helping with S.G.'s medical issues before JFS's involvement.

### GAL's testimony

{¶25} The GAL had been assigned the children since January 2021. While the GAL had never spoken to mother one-on-one, she spoke to mother at a team meeting

where mother had participated. Further, the GAL had not been able to communicate with mother because she was not responsive to the GAL's attempts to contact her.

**{¶26}** The GAL stated both children were bonded to their respective placement families. B.H. had expressed that he did not want to see his mother. B.H.'s foster parents had been coordinating time with his siblings' custodians and foster parents so that the siblings could spend time together.

### C. **The trial court granted JFS's permanent-custody motion**

**{¶27}** The magistrate awarded JFS permanent custody of the children. Mother and father objected. Mother's objection argued that the magistrate's decision was not supported by sufficient evidence and was against the manifest weight of the evidence. Father's objection argued that there was a less-restrictive option other than permanent custody to JFS, the magistrate's decision was against the manifest weight of the evidence where mother "complied with the case plan to the best of her ability," and that he supported the children's reunification with mother.

**{¶28}** The juvenile court overruled the parents' objections, adopted the magistrate's decision, and incorporated the decision into its judgment as follows.

R.C. 2151.414(D)(1)(a) Interactions and Interrelationships

**{¶29}** The children had not visited mother in several months and both fathers had abandoned the children. The children's foster families appropriately cared for the children, and they were bonded to those families. The children maintained a strong bond with their biological siblings.

R.C. 2151.414(D)(1)(b) The Wishes of the Child

**{¶30}** The GAL favored JFS taking permanent custody of both children.

11

<u>R.C. 2151.414(D)(1)(c) Custodial History</u>

**{¶31}** The children had been in the temporary custody of JFS for more than 12 months of a consecutive 22-month period.

<u>R.C. 2151.414(D)(1)(d) Child's Need for Legally Secure Permanent Placement</u>

**{¶32}** The parents failed to show dedication to caring for the children, especially regarding their health needs, and the children needed a legally secure permanent placement, which could not be achieved absent granting JFS permanent custody of the children.

<u>R.C. 2151.414(D)(1)(e) Whether Factors in (E)(7)-(10) Apply</u>

**{¶33}** The court found that the children's fathers had abandoned them.

## II. Assignments of Error

**{¶34}** Mother asserts two assignments of error. She argues that 1) the juvenile court's decision was based on evidence that was either inadmissible or ambiguous, was not supported by sufficient evidence, and was contrary to the weight of the evidence; and 2) the GAL had not performed her duties. Father's sole assignment of error asserts that the juvenile court's decision to grant JFS permanent custody of B.H. was not supported by sufficient evidence. Father's arguments only pertain to his child, B.H., and he does not ask this court to reverse any findings involving him. Father asked that "his appeal [] be viewed in the context of support for Mother, as opposed to reversal of any finding attributed to" father.

### A. **Standard of Review**

**{¶35}** Courts have described permanent termination of parental rights as "the family law equivalent of the death penalty in a criminal case." *In re Smith*, 77 Ohio App.3d 1, 16, 601 N.E.2d 45 (6th Dist.1991). Because parents have a paramount right

to the custody of their children, a juvenile court's judgment granting permanent custody to an agency must be supported by "clear and convincing" evidence. *In re W.W.*, 1st Dist. Hamilton Nos. C-110363 and C-110402, 2011-Ohio-4912, ¶ 46. Clear and convincing evidence is sufficient evidence to "produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954). When applying a clear-and-convincing standard, this court will not substitute its judgment for the trial court's where ample competent and credible evidence supports the trial court's judgment. *In re A.M.*, 1st Dist. Hamilton No. C-190027, 2019-Ohio-2028, ¶ 16.

{¶36} A review of the sufficiency of the evidence is different than a review of the weight of the evidence. *In re A.B.*, 1st Dist. Hamilton Nos. C-150307 and C-150310, 2015-Ohio-3247, ¶ 15. To determine whether sufficient evidence supported a judgment terminating parental rights, we must determine whether some evidence exists on each element. *Id.* at ¶ 15. It is a test for adequacy and is a question of law. *Id.* But a weight-of-the-evidence review in permanent-custody cases requires us to weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflicts in the evidence, the juvenile court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. *Id.* at ¶ 16.

## B. Permanent-custody statute

{¶37} Under R.C. 2151.414(B)'s two-pronged test, a trial court may grant an agency permanent custody of a child only when clear and convincing evidence shows that 1) under R.C. 2151.414(D)(1)'s factors, granting permanent custody is in the child's

best interest, and 2) one or more of R.C. 2151.414(B)(1)(a) to (e)'s conditions exist. *In re B.J.*, 1st Dist. Hamilton Nos. C-200372 and C-200376, 2021-Ohio-373, ¶ 15.

{¶38} R.C. 2151.414(D)'s best-interest standard requires the juvenile court to consider all relevant factors, including 1) the child's interaction and interrelationship with the child's parents, relatives, foster parents, and other persons who may significantly affect the child; 2) the child's wishes, either expressed by the child or through a GAL; 3) the child's custodial history, including whether the child has been in an agency's custody for 12 or more months of a consecutive 22-month period; 4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without granting the agency permanent custody; and 5) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable. *In re S.J.*, 2d Dist. Montgomery No. 25550, 2013-Ohio-2935, ¶ 14-15.

{¶39} The other prong requires a juvenile court to find, by clear and convincing evidence, that one of the R.C. 2151.414(B)(2) factors exists: 1) that the child cannot be placed with either parent within a reasonable time or should not be placed with a parent; 2) the child is abandoned; 3) the child is orphaned, and there are no relatives of the child who are able to take permanent custody; 4) the child has been in the temporary custody of an agency for 12 or more months of a consecutive 22-month period; or 5) the child has been adjudicated an abused, neglected, or dependent child on three separate occasions.

### C. Analysis

{¶40} Father's appeal makes no arguments on his own behalf; instead, his appeal is solely in support of mother. The Ninth District has held that when both parents' rights have been terminated, either parent has standing to assert the other

parent's rights. *In re C. C.*, 9th Dist. Summit No. 24101, 2008-Ohio-3634, ¶ 12. The analysis for father's assignment of error is the same as for mother's first assignment of error: whether the juvenile court's judgment was supported by sufficient evidence. Mother also asserts that the judgment was contrary to the weight of the evidence.

1.  The juvenile court's judgment was supported by credible, competent evidence

### a.  R.C. 2151.414(B)

**{¶41}** The trial court correctly determined that the children were in JFS's temporary custody for more than 12 months of a consecutive 22-month period.

### b.  Competent, credible evidence supported the trial court's determination that permanent custody was in the children's best interest

**{¶42}** Mother argues that the trial court's judgment was based on "evidence that was either inadmissible or ambiguous, which does not result in meeting the clear and convincing standard." She points to S.G.'s counselor's testimony, asserting that it was an expert opinion and that the state failed to establish that she was an expert. But mother neither assigned as error, *see* App.R. 12(A)(2); App.R. 16(A), nor raised to the trial court any argument that the counselor's testimony was inadmissible. *See State v. Morgan*, 181 Ohio App.3d 747, 2009-Ohio-1370, 910 N.E.2d 1075, ¶ 14 (1st Dist.) ("[E]rrors not raised in the trial court in the first instance may not be considered on appeal."). These failures preclude our review of this issue.

**{¶43}** Next, mother asserts that the state failed to show by clear and convincing evidence that she did not visit the children; or that she could not visit for erroneous reasons. She questions the credibility of S.G.'s counselor's statements involving whether visitation should continue because the counselor only met mother one time. But the counselor's concerns about visitation were based on her ongoing

observations of, and interactions with, S.G. After working with S.G. for more than a year, she determined that visiting mother would traumatize S.G.

**{¶44}** The court was in the best position to observe the witnesses and was entitled to believe all, some, or none of the witnesses' testimony. *See In re A.C.*, 1st Dist. Hamilton No. C-180088, 2019-Ohio-2891, ¶ 12, citing *In re Brown*, 98 Ohio App.3d 337, 648 N.E.2d 576 (3d Dist.1994); *In re A.S.*, 1st Dist. Hamilton No. C-180056, 2019-Ohio-2359, ¶ 12, citing *In re L.S.*, 6th Dist. Ottawa No. OT-17-021, 2018-Ohio-4758, ¶ 28. The testimony and exhibits support the juvenile court's finding that mother consistently failed to visit the children. Mother even admitted in her testimony that she lost her visitation due to her own lack of responsibility.

**{¶45}** Mother next argues that she completed case-plan services, was sober for months, attended mental-health treatment, worked full-time, and took accountability for her actions.

**{¶46}** The evidence shows that mother had begun participating in case-plan services and we commend mother for her efforts. But even when a parent completes all case-plan services, full compliance with a case plan is not dispositive of whether a juvenile court should deny JFS's motion for permanent custody. *See In re A.F.,* 1st Dist. Hamilton Nos. C-200230 and C-200231, 2020-Ohio-5069, ¶ 26 ("[T]he dispositive issue is not whether the parents have complied with the case plan, but whether the parent has substantially remedied the conditions that led to the children's removal."); *In re J.G.S.*, 1st Dist. Hamilton No. C-180611, 2019-Ohio-802, ¶ 39 ("A parent's compliance with the case plan does not preclude a trial court from awarding custody to a children services agency, as long as it in the child's best interest.").

**{¶47}** There was competent, credible evidence showing that awarding permanent custody to JFS was in the children's best interest. Other than on one occasion, mother's drug screens were positive for multiple illicit substances. Mother failed to complete a DAF for most of the pendency of the case, which prevented her from obtaining the services that she needed to alleviate the issues that led to the children being removed. Her housing at the time of trial did not permit children to live with her full-time.

**{¶48}** Significantly, the evidence about the children's trauma caused by mother's behavior supports the trial court's conclusion that awarding JFS permanent custody was in their best interest. A JFS caseworker testified about B.H.'s fear and anxiety about safety stemming from mother shooting her boyfriend in front of the children. The GAL testified that after visits with mother, B.H. would become physically sick. S.G.'s counselor testified that S.G. had posttraumatic stress disorder due to the trauma of experiencing "quite a few incidents in the home." For that reason, the counselor believed it was not in S.G.'s best interest to even visit mother, much less live with her. The trial court was not bound to return the children to mother simply because she had participated in services when there was evidence that doing so would cause the children more trauma.

**{¶49}** The juvenile court's judgment granting permanent custody to JFS was supported by sufficient clear and convincing evidence and was not contrary to the manifest weight of the evidence. Mother's first assignment of error and father's sole assignment of error are overruled.

2. The GAL performed her duties as required under Sup.R. 48

{¶50} Mother's second assignment of error asserts that a GAL violates Sup.R. 48.03 when the GAL does not observe the parent with the child. She asserts that because the record does not show that the GAL observed the children with their parents or at their proposed residence, the GAL did not make an informed recommendation about the children's best interest.

{¶51} Mother failed to raise this issue at trial. Therefore, mother has waived all but plain error. *See In re T.K.M.*, 1st Dist. Hamilton No. C-190020, 2019-Ohio-5076, ¶ 26; Juv.R. 40(D)(3)(b)(iv).

{¶52} Sup.R. 48.03(D) governs a GAL's duties. Those duties include observing the child with each parent and visiting the child at the residence or proposed residence. And Sup.R. 48.06, which governs GAL reports, requires a final GAL report to "affirmatively state that responsibilities have been met and shall detail the activities performed, hearings attended, persons interviewed, documents reviewed, experts consulted, and all other relevant information considered by the guardian ad litem."

{¶53} At trial, the GAL testified about her investigation and what she discovered through that investigation. She testified about the children's educational, health, and mental-health needs, ongoing efforts to meet those needs, the children's relationships with foster parents, siblings, and extended family members, the GAL's efforts to identify potential kinship caregivers, the GAL's participation in school meetings, and B.H.'s wishes as expressed to her. She discussed her attempts to contact mother and her inability to do so because she did not have accurate contact information for mother. She testified about mother's unstable housing throughout the case. And she testified that mother was unresponsive to the GAL and the JFS.

18

**{¶54}** We do not find plain error. First, the GAL explained why she did not observe the children with mother and her explanation was not disputed at trial. Moreover, even if we found that the GAL did not comply with her duties, the trial court's judgment was not based solely on the GAL's testimony or report. Rather, the trial court based its judgment on substantial, competent evidence that the mother had not consistently visited the children, did not have housing appropriate for children, had tested positive for illicit substances, and had not remedied the issues that caused the children to be removed from her care. Even without the GAL's testimony and report, the juvenile court's judgment terminating mother's parental rights was supported by substantial clear and convincing evidence.

**{¶55}** We overrule mother's second assignment of error.

### III.   Conclusion

**{¶56}** We have no doubt that mother loves her children, and we commend her for her efforts at gaining sobriety and changing her life. But we find that the juvenile court's judgment was based on substantial clear, competent, and credible evidence. The juvenile court did not err in finding that awarding JFS permanent custody of the children was in their best interest. We affirm the juvenile court's judgment.

Judgment affirmed.

**CROUSE** and **KINSLEY, JJ.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.