# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

IN RE: D.K.                    :        APPEAL NO.   C-250160
                                        TRIAL NO.    F/17/290 Z

                               :

                               :        *JUDGMENT ENTRY*

                               :

This cause was heard upon the appeal, the record, and the briefs.

The judgment of the trial court is affirmed for the reasons set forth in the Opinion filed this date.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs are taxed under App.R. 24.

The court further orders that 1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and 2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**
**Enter upon the journal of the court on 7/11/2025 per order of the court.**

**By:**_____
        **Administrative Judge**

[Cite as *In re D.K.*, 2025-Ohio-2460.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

|  |  |  |  |
|---|---|---|---|
| IN RE: D.K. | : | APPEAL NO. | C-250160 |
|  |  | TRIAL NO. | F/17/290 Z |
|  | : |  |  |
|  | : | *O P I N I O N* |  |
|  | : |  |  |

Appeal From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: July 11, 2025

*Connie M. Pillich*, Hamilton County Prosecuting Attorney, and *Patsy A. Bradbury*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*ProKids, Inc.*, and *Paul Hunt*, for Appellee Guardian Ad Litem,

*Alana Van Gundy*, for Appellant Mother.

**MOORE, Judge.**

**{¶1}** Appellant M.K. ("Mother") appeals the juvenile court's order granting permanent custody of her child, D.K., to the Hamilton County Department of Job and Family Services ("JFS"). In Mother's sole assignment of error, she argues that the juvenile court's decision to grant custody to JFS was not supported by sufficient evidence and was contrary to the manifest weight of the evidence. For the reasons stated herein, we affirm the juvenile court's judgment.

## I.  Factual and Procedural History

**{¶2}** This case arose following a July 16, 2021 incident when a man overdosed at Mother's home. The police were called. When they arrived, they found Mother and her paramour attempting to revive the man. D.K., a newborn baby at the time, was in the home when this occurred. Mother denied drug use in the home and stated the man who overdosed was a stranger who had passed out in front of the home.

**{¶3}** After JFS became involved, the agency implemented a safety plan with the maternal aunt, but the plan failed because the aunt was unable to meet D.K.'s special medical needs. JFS sought, and was granted, a telephone ex parte emergency order on July 26, 2021, to remove D.K. from the home.

**{¶4}** On July 27, 2021, JFS filed a motion for interim custody and a complaint for temporary custody of D.K. The complaint alleged D.K. was dependent because  (1) she lacked adequate parental care because of the mental or physical condition of her parents, and her condition or environment was such that it was in her best interest that the state assume guardianship; (2) Mother appeared to be under the influence upon JFS's arrival and the home was in "deplorable condition" with trash "strewn in the living room and kitchen oven as well as cigarette butts and half eaten food"; (3) the safety plan failed; and (4) alleged father D.R. had moved in with another woman after

the incident involving the overdose victim.

{¶5} A hearing was held the same day the interim custody motion was filed. Mother and D.R. stipulated to the evidence regarding the allegations in the complaint, and to D.K. entering the temporary custody of JFS. The magistrate found the stipulation supported a finding that a temporary order of custody was necessary to protect the best interest of D.K. under R.C. 2151.31 and 2151.33. The guardian ad litem ("GAL") and court appointed special advocate ("CASA") supported the motion for temporary custody.

{¶6} JFS filed an amended complaint on September 28, 2021. The amended complaint stated that there was another alleged father, E.H., and added him as a party to the complaint. All other allegations contained in the original complaint regarding D.K.'s dependency under R.C. 2151.04 remained the same.

The Case Plan

{¶7} The case plan was filed on November 11, 2021. According to the plan, Mother was reported to have a history of substance abuse, which impacted her ability to maintain and provide adequate care for D.K., and her housing conditions were "hazardous to anyone's safety." The plan also requested both alleged fathers submit to genetic testing, and Mother was to have supervised visits with D.K. due to her history with the agency.[1] Mother reportedly acknowledged her need for help.

{¶8} The plan also required Mother to (1) complete a "Diagnostic Assessment of Functioning" ("DAF"), (2) complete parenting classes, (3) obtain and maintain financial stability, and (4) obtain housing that is sufficient for her and D.K. Mother

---

[1] In 2017, another child, K.K., was under the protective supervision of JFS and Mother had to engage in case plan services. Specifically, Mother had supervised visits and was required to submit toxicology screens to JFS. Ultimately, protective supervision was terminated, and K.K. was remanded to the custody of R.K., K.K.'s father.

4

was also to actively engage in recommended services, provide for D.K.'s emotional needs and appropriate supervision, and develop positive parenting skills to identify harmful situations.

**{¶9}** Maternal grandmother, C.M., filed the first of several petitions for custody of D.K. on December 7, 2021, which asserted that Mother's home was dirty. C.M.'s petitions were ultimately either dismissed or withdrawn prior to the final disposition in this matter.

**{¶10}** Following a January 3, 2022 pretrial hearing, the magistrate entered an order, which stated that JFS's goal was to reunify D.K. with Mother, and Mother had completed a DAF and was engaging in case-plan services. The entry further stated that Mother reported her engagement in services through The Crossroads Center (Crossroads"), and she had provided a release of information so JFS could obtain those records. D.K. had special health needs, so JFS was seeking a foster home placement as D.K.'s two prior kinship placements and her current foster home were unable to meet those needs. The GAL agreed that D.K. needed to be placed at another foster home. During this period and pending completion of her intake for the Family Nurturing Center ("FNC"), Mother's supervised visits with D.K. were held at the agency.

**{¶11}** The entry also stated a home study was to be conducted at C.M.'s home.

<u>The joint report of the GAL and CASA</u>

**{¶12}** The GAL and CASA filed a joint report on April 20, 2022. The report explained that Mother was to continue individual therapy at Crossroads and continue attending Alcoholics Anonymous ("AA") meetings.

**{¶13}** ProKids, Inc., ("ProKids") also submitted a report, which stated that Mother had not begun parenting classes as required by the case plan. ProKids also had no knowledge of Mother's AA attendance or urine screen results due to the limited

amount of information being provided to JFS. Mother was, therefore, requested to give attendance slips to JFS and submit to random toxicology screens.

{¶14} Mother had missed 11 out of 23 visits with D.K. As a result, she was required to call on the day before visits to confirm that she would attend ("call-ahead schedule"). Mother, however, was expected to continue supervised visits at FNC.

{¶15} The report stated that Mother had not begun parenting enrichment classes as required by the case plan.

{¶16} The joint report was incorporated into the magistrate's entry following the April 28, 2022 pretrial hearing. The entry stated that one to two of Mother's visitation hours were being cancelled due to her inconsistent visits and her being placed on the call-ahead schedule; however, Mother could regain those hours once she completed four consecutive visits. Because Mother had attributed her missed visits to her work schedule, FNC moved the visits to Saturdays and added a two-hour weekday visit to accommodate Mother's work schedule.

{¶17} At the time of the hearing, Mother was taking parenting classes, and her Crossroads counselor was sending Mother's AA attendance slips to the caseworker.

{¶18} The entry reflected that the home study denied C.M. as a placement for D.K.; JFS concluded C.M. was unable to set boundaries with Mother for D.K.'s safety and unwilling to follow the recommendations of the juvenile court and JFS regarding supervised visits.

JFS is granted its first motion to extend temporary custody.

{¶19} JFS filed its first motion to extend temporary custody of D.K. on May 4, 2022, which reflected that Mother was engaging in recommended counseling services but needed to be consistent with visits at FNC, complete the remaining parenting classes, and maintain her sobriety. Neither E.H. nor D.R. (the two alleged fathers) had

6

engaged in case-plan services. The goal remained to reunify D.K. with Mother.

**{¶20}** On June 9, 2022, an updated case plan was filed to remove D.R. as an alleged father based on the results of genetic testing. E.H. was listed as an "absent parent" whom the agency could not locate.

**{¶21}** A hearing was held on the motion on June 13, 2022. The entry stated all parties—except alleged father, E.H., who had not engaged in case-plan services or the court process, agreed to the first extension of temporary custody. Mother was visiting with D.K. for four hours weekly at FNC, had completed parenting classes, had received individual therapy, and had submitted to drug screens at Crossroads, and was reportedly working toward finding employment. The entry further stated that Mother would be submitting to random toxicology screens through JFS.

**{¶22}** JFS's first motion to extend temporary custody was granted.

<u>August 2022 Semiannual Administrative Review and GAL/CASA Reports</u>

**{¶23}** The first "Semiannual Administrative Review" ("SAR") was held on August 19, 2022. According to the SAR report, Mother's frequently changing work schedule made it difficult for the caseworker to engage Mother. The report also explained that Mother's therapist at Crossroads informed JFS that Mother had missed "a number of appointments in June and all of her July appointments." The report stated that Mother informed JFS that she had COVID-19 during the period she missed the appointments. The SAR also conveyed that Mother had resumed counseling, was considering obtaining a sponsor, had completed parenting classes, was consistently visiting with D.K. and engaged well with her, and had good communication with her foster mother. The caseworker reported Mother had "done well addressing the conditions of the home," and expected her to continue to stabilize her home.

**{¶24}** The caseworker expressed concern that she learned that Mother was in

the hospital after being "jumped" on Memorial Day, May 30, 2022, from a police report instead of Mother. The caseworker also reported that there was a separate incident involving Mother and the Colerain police on June 21, 2022. According to the police report, Mother was intoxicated during the incident. Mother, however, denied this allegation during the SAR meeting.

**{¶25}** The GAL and CASA filed a report on August 31, 2022. The GAL and CASA expected Mother to provide AA attendance slips to JFS and submit to random toxicology screens through JFS. The concerns expressed in the report included that Mother (1) had an "Interlock device" installed in her car due to prior convictions for operating a vehicle under the influence of alcohol or drugs ("OVI"), (2) missed all therapy appointments in July, (3) tested positive for Buprenorphine and Norbuprenorphine[2][3] on July 12, 2022, (4) had not maintained consistent employment during the summer (as noted by Mother's therapist who also expressed concern for Mother's mental health), (5) had been assaulted while walking home at the end of May 2022 requiring her to be hospitalized, (6) was reported by Colerain police to have been "heavily intoxicated" on June 21, 2022, (7) had not begun parenting classes, and (8) had been inconsistent with visits due to reported illness. The GAL and CASA recommended that Mother's level of treatment be reevaluated due to the recent positive urine screen and "observed relapse of alcohol."

---

[2] Buprenorphine is an opioid drug and norbuprenorphine is the major metabolite of buprenorphine. National Library of Medicine, *Quantitation of Buprenorphine, Norbuprenorphine, Buprenorphine Glucuronide, Norbuprenorphine Glucuronide, and Naloxone in Urine by LC-MS/MS,* https://pubmed.ncbi.nlm.nih.gov/26660175/#:~:text=Abstract,;%20Suboxone;%20Urine;%20Zubsolv (accessed June 4, 2025).

[3] The report did not specify that they were opioids, so this court takes judicial notice. *See State v. Brock*, 34 Ohio App.2d 175, 176 (1973), citing 21 Ohio Jur.2d 76, Evidence, § 63 (1956) ("[C]ourts may take judicial notice of any scientific fact which may be ascertained by reference to a standard dictionary or is of such general knowledge that it is known by any judicial officer.").

**{¶26}** On September 8, 2022, the magistrate entered an order following a pretrial hearing accepting the SAR and joint GAL and CASA reports into the record. The entry referenced the May 2022 and June 2022 incidents. Mother denied being intoxicated during either incident or having relapsed despite her therapist's reported concerns. Mother also denied using illegal substances despite the positive drug screen in July 2022, claiming her screen was mixed up with someone else's.

**{¶27}** Mother had been inconsistent with counseling at Crossroads. Her counselor at that time reported her concern that Mother had relapsed and was potentially mentally unstable. Because the magistrate, the GAL, the CASA, and JFS shared these concerns, Mother was expected to meet with the caseworker to update the release of information ("ROI") so that toxicology screens could be referred through JFS. Mother was to complete an updated DAF and follow all recommendations. The entry further reflected that Mother had completed parenting classes and was maintaining housing and employment.

### JFS moves for a final time to extend its temporary custody of D.K.

**{¶28}** On October 28, 2022, JFS filed its "Second and Final Motion to Extend Temporary Custody to [JFS]." The motion reflected that reunification remained the goal although Mother "sporadically" engaged in services and visitation with D.K. Mother was requested to consistently visit D.K., complete an updated DAF and follow all recommendations, reengage with Crossroads' substance-abuse counseling, and submit to random urine screens.

**{¶29}** All parties agreed with the motion to extend temporary custody during a December 5, 2022 pretrial hearing. The magistrate's entry stated Mother's visits with D.K. remained inconsistent and directed Mother to continue treatment, maintain sobriety, and allow JFS and the GAL access to her home. The entry also noted E.H.'s

9

refusal to participate in the proceedings.

<u>Mother's visits with D.K. remained inconsistent while she failed to show engagement with therapy services.</u>

**{¶30}** An SAR was held on February 9, 2023. Mother reported continued attendance at AA two to three times per week through "Tri-County Center" and "Oak Street" and engagement in counseling through Crossroads every other week. Mother also reported that she had not been drinking since June 2022, and that she had a full-time job but was seeking new employment because her job was in Kentucky. Mother added that she directed Crossroads to communicate with JFS regarding AA attendance slips.

**{¶31}** The caseworker reported that Mother missed most of her recent toxicology screens and JFS had not been able to verify her treatment progress. The report also reflected a concern regarding visits. FNC informed the caseworker that Mother would be placed on a "plan." Mother responded that she had no knowledge of this. Still, reunification remained the goal. The report was incorporated into the record in the magistrate's February 27, 2023 entry.

**{¶32}** GAL and CASA filed a joint report on April 3, 2023. The joint report stated that Mother had four negative urine toxicology screens and one negative hair-follicle test since September 2022 but noted that Mother missed a urine screen on January 25, 2023. The report also explained that Mother's visits with D.K. remained inconsistent, Mother having missed ten visits between September 2022 and March 2023. According to the report, Mother gave multiple reasons for missing visits with D.K., including locking her keys in her car, engine trouble, and grandmother blocking her car in the driveway. The report also documented that Mother was late for the visits with D.K. that she did attend, which prompted FNC to require her to attend six visits

in a row or face removal from the list.

**{¶33}** The joint report of the GAL and the CASA was incorporated into the record during the April 6, 2023 pretrial hearing. The magistrate noted Mother's continued inconsistency in visits required her to arrive an hour early to visits at FNC. The CASA reported Mother's counselor with Crossroads informed the CASA that the counselor had had four contacts with Mother since January 2023, one of which was in-person. As a result, Mother had only submitted to one drug screen through Crossroads. Although she claimed that she was attending AA, Mother did not provide her counselor with attendance slips to document her attendance.

<u>JFS moves to modify temporary custody to permanent custody.</u>

**{¶34}** On June 7, 2023, JFS filed a motion for permanent custody of D.K. The motion stated that D.K. was placed in JFS's temporary custody on September 25, 2021, thus she had been in temporary custody for the requisite consecutive 12 or more months of a consecutive 22-month period under R.C. 2151.28. It stated that the conditions that caused D.K.'s removal were "deplorable living conditions and substance abuse concerns," and Mother's DAF showed diagnoses of alcohol use disorder, adjustment disorder, and a personal history of physical violence involving spouses or partners.

**{¶35}** The motion further cited Mother's (1) inconsistent engagement with substance abuse and submission to toxicology screens, (2) failure to provide attendance slips to show her participation in AA, (3) inconsistent visits with D.K. as Mother was often late to or missed the visits, (4) and failure to attend D.K.'s doctor's visits despite having notice of dates and times. The motion also stated that the alleged father, E.H., did not want to be involved in case-plan services. Finally, the motion stated that the maternal grandmother was an unsuitable caretaker due to "several

historical reports of [grandmother] being the perpetrator of abuse," and concerns with her willingness and ability to follow through with agency and court recommendations. According to the motion, grandmother had also not visited the child since October 2022.

<u>The final pretrial SAR report and joint reports of the GAL and CASA</u>

**{¶36}** A SAR was held on February 28, 2024. Mother did not participate. The SAR report stated that Mother was living in a hotel after selling her home for what she asserted were financial reasons. She was working through a "temp agency." Mother reportedly appeared intoxicated—and admitted to drinking—during the caseworker's home visit on May 26, 2023. The caseworker reported that efforts to meet Mother had not been successful; consequently, the caseworker did not know Mother's status with substance abuse treatment. Mother's visits with D.K. remained inconsistent, Mother having last visited D.K. on August 8, 2023. JFS could not refer Mother for visits as the release of information had expired. The report reflected that both parents' lack of engagement led to the agency's continued involvement, and Mother had not maintained treatment or stable housing.

**{¶37}** On May 3, 2024, GAL and CASA filed a joint report in support of placing D.K. in JFS's permanent custody as Mother (1) inconsistently engaged with substance abuse treatment and counseling services, (2) had not regularly submitted to toxicology screens for JFS, (3) failed to maintain stable housing as she was living between a hotel and her mother's home, and (4) continued to be late to visits or missed them altogether and had not visited D.K. since August 2023. Further, E.H. had not engaged in services, and D.K. had been in the temporary custody of JFS for over 12 months of a consecutive 22-month period.

**{¶38}** Another SAR was held on August 15, 2024. Mother did not participate.

The report reiterated that Mother had not obtained stable housing since selling her house, had not been consistent with substance abuse treatment and individual counseling, and had relapsed, and alleged father was not involved with the child. The caseworker reported that Mother informed her that she had housing but cancelled the home visit. Mother resumed visits in May 2024 after she had not visited the child since August 2023, and concerns remained regarding Mother attending the visits.

The Trial

**{¶39}** The trial on JFS's motion for permanent custody commenced on August 20, 2024.

*The caseworker's testimony*

**{¶40}** The caseworker testified regarding how JFS initially became involved following the overdose incident inside Mother's home when D.K. was a newborn.

**{¶41}** The caseworker recalled the case plan services that Mother was to engage in to reunify Mother with D.K. The caseworker testified that the grant of permanent custody was in D.K.'s best interest because Mother had not demonstrated the behavioral changes the agency "would like to see" to address her substance abuse issues. She stated that Mother had been engaging in substance abuse treatment with Crossroads, where she recently reengaged in treatment, and thus, was in substantial compliance with individual counseling "as of right now." Mother's initial counselor automatically provided drug screen results, but her current counselor "sometimes [did not] always respond to e-mails."

**{¶42}** The caseworker explained that Mother voluntarily entered a detox program with Seacrest in July 2024, but she did not complete the program due to unexplained issues with others in the program. She expressed concern that Mother felt she needed to undergo detox despite being engaged with Crossroads and testified

13

that Mother had not successfully completed substance abuse treatment.

**{¶43}** The caseworker expressed concern about Mother's alcoholism due to police runs that involved Mother's previous home, and an incident where the caseworker and the CASA observed Mother being intoxicated during a home visit where Mother admitted to drinking.[4] She explained that Mother smelled of alcohol, was staggering when she walked out of the house, had slurred speech, and was "very disheveled." Mother also reported having been raped[5] around that time, and the caseworker reported that during her visit she observed blood running down Mother's leg.

**{¶44}** The caseworker recalled an incident in 2024 when maternal grandmother called both "241-KIDS" and the caseworker and reported that Mother had been drunk for three days and physically assaulted grandmother, which Mother denied. Mother also denied reports from her sister, who was D.K.'s initial placement, that Mother came to the visits drunk. The caseworker further testified that Mother had an Interlock installed on her car due to having multiple OVI convictions, but that car was totaled in a recent accident.

**{¶45}** The caseworker explained that Mother's visits with D.K. were inconsistent and had been stopped twice, which required additional referrals to resume the visits. She stated that, although Mother complained of conflicts with her work schedule, she would discuss changing the schedule with FNC instead of the caseworker; either way, Mother would have to be put on the wait list by requesting to change the schedule. Mother began to visit D.K. in May 2024 after ceasing to visit her

---

[4] The February 2024 SAR reflects that the caseworker observed Mother's being visibly intoxicated during a May 2023 home visit.
[5] The caseworker testified at trial that she was uncertain whether Mother filed criminal charges related to the claimed rape.

in August 2023 and again in October 2023. As of the date of trial, Mother was once again required to call ahead as she missed at least three visits since May 2024. The caseworker added Mother never advanced to unsupervised or community visits.

**{¶46}** The caseworker expressed concern that Mother was unable to maintain stable housing; Mother initially had stable housing, but, after selling her house in early 2024, she stayed in hotels and with her mother "for the [previous] four or five months [before trial]." On the day before trial, Mother showed the caseworker a picture of a lease. Mother signed it on July 31, and the landlord signed it on the day before the trial. The caseworker was unable to assess the apartment prior to the trial.

**{¶47}** The caseworker testified to D.K.'s initial placement with a maternal aunt which ended due to aunt's inability to meet D.K.'s medical needs, and the maternal grandmother's unsuccessful petitions for custody and failed home study. The caseworker explained that a friend of Mother had an approved home study, but placement was denied after the friend left D.K. in a car with a six-year-old.

**{¶48}** The caseworker further testified that Mother had not maintained housing or consistently maintained employment.

*Foster mother's testimony*

**{¶49}** Foster mother, L.J., testified that there were "chunks of months" where visits were canceled, and Mother did not have contact with D.K. between August 2023 and May 2024, when visits had been reinstated. L.J. also reported that neither parent attended any of D.K.'s medical appointments.

**{¶50}** L.J. testified that D.K. was bonded to her and her family; D.K. called her "mom," her husband "dad," and viewed their biological son as her brother. L.J.

explained D.K.'s medical needs as having been diagnosed with "3-MCC"[6] and "lazy eye," for which D.K. needed medication and routine doctor visits. L.J. explained that before D.K. turned two years old, she had more frequent medical visits, but more recently D.K. goes to a geneticist annually, and twice a year if bloodwork is needed. L.J. testified she provided Mother with doctor's appointments dates and times until it became "sort of abuse of he said/she said kind of communication with [the caseworker] and so [she] [stopped] communication" because she "didn't want any lines being crossed." L.J. since communicated the information to Mother through the caseworker.

*Mother's testimony*

**{¶51}** Mother testified to completing a DAF "more than once" and seeing her counselor at Crossroads for mental health and drug and alcohol counseling "on and off for seven years." Mother explained that the counselor updated her treatment plan every three months. Mother also testified to being "forced" by her mother to attend a detox program at Lumiere from July 3, 2024, until July 9, 2024, and having been released to the program at Seacrest on that same day. Mother conceded she relapsed at times within the previous year or so, which was why she entered detox. She explained that she did not stay at Seacrest because it "just really wasn't for [her]" due to what she described as "a lot of drama" and "sexual [sic] type conduct" between the staff. Mother testified that she went back to work after leaving Seacrest and had been sober since July 3, 2024.

**{¶52}** Mother also testified that she regularly spoke with her sponsor and

---

[6] MCC is the acronym for 3-methylcrotonyl-CoA carboxylase deficiency (also called MCC deficiency), which is an inherited disorder in which the body is unable to process certain proteins. https://medlineplus.gov/genetics/condition/3-methylcrotonyl-coa-carboxylase-deficiency/ (accessed June 4, 2024).

attended AA meetings at either Tri-County Center or Oak Street two to three times per week throughout the pendency of the case. She explained that her attendance slips went to her Crossroads counselor, not the caseworker. She acknowledged that she was an alcoholic and explained how she intended to maintain her sobriety.

{¶53} Mother admitted she was living at hotels or maternal grandmother's home before signing a lease for a "large one-bedroom" apartment on July 31, 2024. The caseworker was scheduled to conduct a home assessment of the apartment that week. Mother explained that she and D.K. would sleep in the same bedroom and she had a toddler bed for D.K. to sleep in. Mother stated that the location of her apartment was in a safe area unlike her previous home in Colerain where there was "something every minute when you drive down the street."

{¶54} Mother testified that she had been employed with "Staffmark" temporary agency "on and off" for "about three years." She completed parenting classes sometime in 2023. Mother stated that she had a visit with D.K. in October 2023 at Justice Works. She described it as "small," "chaotic," and a place she did not believe was good for D.K. to be. She explained that she chose not to attend the following two visits and asked the caseworker to make a referral so that she could be placed on the waiting list for FNC. Mother asserted that she did not visit D.K. between October 2024 and April 2024 because she did not know where she could visit her and she did not know that she could visit D.K. at JFS. She testified that she attempted to remedy the situation by calling foster mother to get her to agree to a time to make visits work.

{¶55} Mother indicated that she could have resumed visits as early as December 2024, but she could not communicate with the caseworker because the caseworker's phone number changed, and the foster mother would not agree to a date and time so visits could start in April 2024. She completed the new intake for FNC in

March 2023 and began visiting D.K. again in May 2024. Mother explained that she missed visits during the week of trial due to a flat tire on her car and due to illness in the previous week. She lived ten to 15 minutes away from FNC, but she would not have caught the "right" bus, and taking an Uber would have made her late. Her most recent visit occurred on the previous Saturday.

{¶56} Mother testified to being bonded with D.K. Mother explained that D.K. was born with "organic acid disorder" and her medication helps with her digestion issues. She stated that she did not attend D.K.'s medical appointments because she was never informed of them. Mother testified that she had support to help care for D.K., including family and childcare during Mother's work hours.

{¶57} The GAL and CASA's May 3, 2024 joint permanent custody report was accepted into evidence. As D.K. began preschool that year, and evaluations needed to be done, the magistrate appointed Mother as the child's primary education decision-maker and the GAL as secondary.

{¶58} The magistrate took the matter under advisement.

### The magistrate grants JFS's motion for permanent custody.

{¶59} The magistrate made an entry on the permanent-custody motion on September 23, 2024. She found that JFS had temporary custody of D.K. for over 16 months when the permanent-custody motion was filed, meeting the 12 or more months of a consecutive 22-month period requirement under R.C. 2151.414(B)(1)(d).

{¶60} The magistrate acknowledged that Mother completed two DAFs through FAIR, engaged in counseling and treatment at Crossroads and attended AA meetings as of June 2022, and testified that she had been sober since July 3, 2024, and was on "step 4" of the "12 step program." The entry reflected that, while Mother showed "some insight into her alcohol addiction," she had not successfully completed

a substance abuse program, or maintained a lengthy period of sobriety. The entry noted that Mother testified that she wanted to complete intensive outpatient treatment ("IOP"), but she was not engaged in IOP at the time of trial. The magistrate also acknowledged Mother completed her parenting classes.

{¶61} The magistrate, however, found that clear and convincing evidence showed a grant of permanent custody was in D.K.'s best interest under R.C. 2151.414(D).

{¶62} The entry stated that Mother had not consistently attended Crossroads between September 2022 and April 2023, and there were reports of concern that she relapsed. Mother's counselor through Crossroads at the time of trial also had not provided updates to JFS regarding Mother's progress in the program or drug screen results. Mother had not been providing AA attendance slips to JFS, and she had prior OVIs which led to an Interlock being placed on her vehicle in September 2022. Mother's charge for assault in July 2023, which was dismissed for want of prosecution, was also noted.

{¶63} The magistrate found that Mother had not obtained stable housing since selling her home earlier that year. Although Mother's apartment was found to be appropriate for D.K., she had only been in it for a few weeks. Also, while Mother testified that she was working full-time at a job for five or six weeks, which began two days after she left in-patient treatment, the magistrate concluded that Mother failed to obtain and maintain income.

{¶64} The magistrate also found that Mother had not consistently visited with D.K. since D.K. had been in JFS's custody. She noted Mother's cancelled visits at the FNC after she was put on the call-ahead schedule due to missing visits, then Mother stopped visits at Justice Works in October 2023 and requested to do visits at FNC. The

entry also noted that Mother stated she did not want to restart supervised visits during an October 2023 hearing, and she did not resume visits until May 2024.

**{¶65}** The magistrate considered Mother's testimony as to the delay in resuming visits; but, although Mother was making weekly supervised visits with D.K. at the time of trial, she was again on the call-ahead schedule and continued to miss visits. The magistrate noted the reasons Mother gave for the missed visits; however, she concluded that Mother failed to acknowledge her decisions and choices for missing visits and the period of months that lapsed in visitation.

**{¶66}** The magistrate concluded that Mother had not remedied the issues which caused the removal of D.K. from her care. The entry explained that D.K.'s health progressed while in her current foster home and she was thriving, and she was bonded to her foster family. Finding by clear and convincing evidence that permanent custody was in D.K.'s best interest, the magistrate addressed the R.C. 2151.414(D)(1) factors to support her decision, as discussed below.

<u>Mother objects to the magistrate's decision.</u>

**{¶67}** Mother timely filed objections to the magistrate's decision to grant permanent custody to JFS, asserting that she had remedied the issues that caused D.K. to come into the temporary custody of JFS and the magistrate failed to find that permanent custody was in D.K.'s best interest. Mother based her assertion on her engagement in services through Crossroads and AA, completion of her parenting classes, "visitation with favorable results," her demonstrated knowledge of D.K.'s medical needs, and having "gainful employment and independent housing." Mother contended that no evidence was presented to "credibly suggest" that she did not have stable housing and income, was unable to care for the child, or had not been sober since July 3, 2024.

The Juvenile Court's entry

**{¶68}** The court's entry reflected that, upon an independent review of the record, the child had been in the temporary custody of JFS for the requisite period under R.C. 2151.414.(B)(1)(d). As discussed below, the court also considered the factors under R.C. 2151.414(D)(1)(a)-(e).

**{¶69}** The court noted that, although Mother and D.K. have a "great" relationship, Mother did not consistently visit D.K., for which she gave "various explanations." D.K. had been with her foster family, which she also has a "great relationship" with, since January 2022. R.C. 2151.414(D)(1)(a). The GAL supported permanent custody as D.K. was too young to express her wishes or to understand the nature of the proceedings. R.C. 2151.414(D)(l)(b). D.K.'s custodial history consisted of being in JFS's temporary custody for over 16 months when JFS's motion for permanent custody was filed. R.C. 2151.414(D)(l)(c).

**{¶70}** The court found that a legally secure placement could not be achieved without a grant of permanent custody due to Mother's inability to maintain sobriety, complete any substance abuse program she engaged in, maintain housing and income, attend D.K.'s medical appointments "to familiarize herself with D.K.'s medical condition," and progress beyond supervised visitation. R.C. 2151.414(D)(l)(d). The court acknowledged that Mother "finally" made some progress in the case plan by the time of trial, but was unable to care for D.K. It concluded that R.C. 2151.414(E)(7)-(11) did not apply to Mother. *See* R.C. 2151.414(D)(l)(e).

**{¶71}** The juvenile court found that permanent custody was in D.K.'s best interest and overruled Mother's objections to the magistrate's decision. The court approved the magistrate's decision and incorporated it into its entry granting JFS's motion for permanent custody.

21

**{¶72}** This appeal followed.

## II.   Analysis

**{¶73}** Mother's sole assignment of error on appeal challenges the sufficiency and manifest weight of the evidence. Mother argues that she sufficiently completed the case plan because she remedied the issue that brought D.K. into JFS's care by moving from the home where the man overdosed. Mother also argues that she completed the case plan by engaging in therapy and recognizing when she "is in danger of not remaining sober," and that no positive toxicology results were produced to show that she was abusing substances. Mother further asserts that no evidence was presented to show that her home was unsafe, that she abandoned the child, that the child was at risk with Mother, or that she did not understand the child's medical needs. Mother also contends she was never informed of the child's medical appointments.

**{¶74}** R.C. 2151.414 provides that a juvenile court may grant an agency permanent custody of a child only when clear and convincing evidence shows (1) one or more conditions exist under R.C. 2151.414(B)(1)(a)-(e), and (2) the juvenile court considered all relevant factors listed in R.C. 2151.414(D)(1), which is not exhaustive, in determining the best interest of the child. *See In re B.H.*, 2024-Ohio-423, ¶ 37 (1st Dist.); R.C. 2151.414(B)(1); R.C. 2151.414(D)(1).

**{¶75}** Clear and convincing evidence is sufficient evidence to "produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *In re B.H.* at ¶ 35, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. When applying a clear-and-convincing standard, this court will not substitute its judgment where ample competent and credible evidence supports the trial court's judgment. *Id.*

### A.  Sufficiency and Weight of the Evidence

**{¶76}** To determine whether sufficient evidence supported a judgment terminating parental rights, we must determine whether some evidence exists on each element. *Id.* at ¶ 36. It is a test for adequacy which contemplates the burden of production and is a question of law which we review de novo. *See In re A.B.*, 2015-Ohio-3247, ¶ 15 (1st Dist.).

**{¶77}** A weight-of-the-evidence review in permanent-custody cases requires us to weigh the evidence and all reasonable inferences and consider the credibility of the witnesses. *In re B.H.*, 2024-Ohio-423, at ¶ 36 (1st Dist.). In resolving conflicts in the evidence, we must determine whether the juvenile court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. *Id.* A manifest-weight challenge regards the burden of persuasion. *In re A.B.* at ¶ 15.

<u>Granting permanent custody was in D.K.'s best interest under R.C. 2151.414(B).</u>

**{¶78}** Clear and convincing evidence demonstrated the grant of permanent custody was in D.K.'s best interest under R.C. 2151.414(B)(1)(d) because D.K. had been in the temporary custody of an agency for 12 or more months of a consecutive 22-month period.

**{¶79}** R.C. 2151.414(B)(2) provides permanent custody may be granted where the court determines one or more factors of the factors listed in R.C. 2151.414(E) exist, and permanent custody is in the child's best interest under R.C. 2151.414(D). As explained below, clear and convincing evidence shows that four of these factors are met, with three applying specifically to Mother.

<u>The juvenile court properly considered the relevant factors as to D.K.'s best interest under R.C. 2151.414(D).</u>

**{¶80}** The factors in R.C. 2151.414(D) include (1) the child's interaction and interrelationship with the child's parents, relatives, foster parents, and other persons

23

who may significantly affect the child; (2) the child's wishes, either expressed by the child or through a GAL; (3) the child's custodial history, including whether the child has been in an agency's custody for 12 or more months of a consecutive 22-month period; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without granting the agency permanent custody; and (5) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable. *In re B.H.*, 2024-Ohio-423, at ¶ 38 (1st Dist.).

**{¶81}** The record supports the juvenile court's finding that permanent custody is in the child's best interest under R.C. 2151.414(D)(1). While acknowledging Mother's love for the child, the court also considered that D.K. was bonded to her foster family and was thriving in her foster parents' care. *See* R.C. 2151.414(D)(1)(a).

**{¶82}** As D.K. was too young to express her wishes under R.C. 2151.414(D)(1)(b), the GAL, on her behalf, recommended permanent custody was in D.K.'s best interest.

**{¶83}** D.K. had been in JFS's temporary custody for over 16 months at the time of the filing of the motion for permanent custody, which satisfied the requirement under R.C. 2151.414(D)(1)(c) that D.K. be in JFS's temporary custody for 12 or more months of a consecutive 22-month period.

*D.K.'s need for a legally secure placement under R.C. 2151.414(D)(1)(d)*

**{¶84}** Mother was to engage in substance abuse counseling, obtain and maintain financial stability, obtain stable and sufficient housing for her and D.K., develop parenting skills to "help her identify harmful situations," and provide for not only the child's emotional needs but also appropriately supervise the child. Mother was also expected to consistently visit D.K. Although Mother was complying with the case plan by trial regarding her sobriety, having stable housing, and being employed,

the record supports the juvenile court's finding that her sobriety, visits, and maintaining a stable income were inconsistent. Further, she obtained stable housing only days before the trial.

**{¶85}** The court accepted the reports of JFS and joint reports by the GAL and CASA into the record throughout the pendency of the case. These reports consistently reflected Mother's inconsistent visits with D.K., missing counseling sessions for periods of time, failure to provide JFS with AA attendance slips, and struggles with her sobriety as recently as one month prior to trial.

*Mother's struggles with sobriety.*

**{¶86}** Mother "failed . . . repeatedly to substantially remedy the conditions" which caused the child to be removed. *See* R.C. 2151.414(E)(1). Specifically, the record evidence showed that Mother struggled with alcohol throughout the three years this matter was pending. She was noted to have an Interlock on her car due to multiple OVI convictions from 2022 until, apparently, the car was totaled in 2024. Mother had also relapsed only about a month before the trial on the motion for permanent custody and failed to complete detox after that relapse. Mother also failed to submit to toxicology tests at JFS and did not provide AA attendance slips to JFS. The caseworker also testified to witnessing Mother's intoxication during a home visit. Testimony and evidence submitted to the court reflected Mother was reportedly intoxicated during at least one of the police runs to her home.

**{¶87}** R.C. 2151.414(E)(2) is met because Mother suffers from chronic alcohol dependency that is "so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing."

*Mother's inability to maintain stable housing and employment.*

**{¶88}** JFS determined Mother's home was in "deplorable condition." Mother stopped having stable housing too close to the trial; she sold her house early in 2024 and remained homeless for roughly four or five months. She stayed at either hotels or her mother's home during that time. She apparently was able to eventually secure an apartment, however the lease on that apartment was not properly executed until only days before trial.

**{¶89}** The record evidence supports the trial court's finding that Mother was inconsistently employed as Mother testified to having jobs on and off through a temporary service throughout the pendency of the proceedings.

*Mother's inconsistency in visiting D.K. throughout the proceedings.*

**{¶90}** Finally, Mother "demonstrated a lack of commitment toward the child by failing to regularly . . . visit . . . or communicate with the child when able to do so." *See* R.C. 2151.414(E)(4). Mother never accepted accountability for the periods she went without visiting or communicating with D.K.; she blamed others and claimed that she did not know that she could visit through JFS where the record reflects that was where visits were held at the outset of the case.

**{¶91}** The record is replete with instances where Mother was late for visits or missed them altogether, causing the caseworker to send new referrals at least twice so visitation could resume whenever Mother was ready to do so. Mother's attendance caused her to be on the call-ahead schedule and eventually removed from visitation at FNC. Mother admitted to foregoing her visits at Justice Works and, when asked what she did to remedy her inability to visit D.K. while she waited to be put back on the list at FNC, she blamed the caseworker for being difficult to contact and claimed foster mother prevented visits from resuming earlier than May 2024.

**{¶92}** The SAR and GAL/CASA reports reflected that Mother's visits were

inconsistent throughout the pendency of the case, where she failed to visit between August 2023 and October 2023, and restarted visits in October 2023 but stopped going based on her determination that it was not a good environment for D.K. Again, she did not accept accountability for failing to visit between October 2023 and May 2024 when she started visiting D.K. again. Although the caseworker did not observe visits, the agency apparently received reports from FNC and Justice Works regarding the supervised visits facilitated at either location. Further, Mother never advanced to unsupervised visits with D.K., calling into question her ability to appropriately supervise the child.

**{¶93}** Mother argues that she did not attend D.K.'s doctor's appointments because she was never told about them. The foster mother, L.J., stated she initially directly informed Mother of the doctor's appointments but began to communicate information to Mother through the caseworker out of concern that Mother was engaging in "he said/she said" regarding the caseworker. The magistrate apparently found L.J.'s testimony credible in concluding that Mother failed to attend D.K.'s appointments.

*The evidence showed that D.K. needed a legally secure placement which could not be achieved without granting permanent custody.*

**{¶94}** The trial court agreed that, even if Mother could meet D.K.'s medical needs, other factors weighed in favor of the grant of permanent custody. Mother asserts there was no testimony that the foster family wished to adopt D.K., but she provides no authority to show that a foster parent must wish to adopt a child that is in the temporary custody of an agency to determine whether a grant of permanent custody is in that child's best interest. Further, R.C. 2151.414 is silent as to whether a child must be in the process of being placed for adoption.

**{¶95}** Instead, R.C. 2151.414(D)(1)(d) only requires the juvenile court to determine whether a child's need for a legally secured permanent placement can be achieved without the grant of permanent custody. Here, the evidence supported the trial court's finding.

**{¶96}** Mother raises the abandonment finding as to Father, arguing she did not abandon D.K. Her argument is misplaced. Under R.C.2151.414(E), a juvenile court "shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent" if it determines by clear and convincing evidence that any of the factors enumerated in R.C. 2151.414(E)(1)-(16) exist "as to each of the child's parents."

**{¶97}** The juvenile court adopted the magistrate's decision as it pertained to Father's abandonment of D.K. under R.C. 2151.414(E)(10). The juvenile court, however, specifically stated that the abandonment factor did not apply to Mother. The factors that applied to Mother, as set forth above, were R.C. 2151.414(E)(1), (2), and (4). The juvenile court's findings were proper as it needed only to find one factor to disqualify Mother as a placement to justify its permanent-custody determination under R.C. 2151.414(E). *See In re Y.H.*, 2023-Ohio-4554, ¶ 35 (1st Dist.).

### III.    Conclusion

**{¶98}** Nothing in the record suggests that the court lost its way and manifested a miscarriage of justice. The agency met its burden to show Mother failed to substantially comply with case-plan services, and the juvenile court's grant of permanent custody was not against the manifest weight of the evidence. Accordingly, clear and convincing evidence supported the juvenile court's grant of permanent custody to JFS.

**{¶99}** We, therefore, overrule Mother's sole assignment of error and affirm the

juvenile court's judgment.

Judgment affirmed.

**CROUSE, P.J.,** and **NESTOR, J.,** concur.