[Cite as *In re M.S.*, 2025-Ohio-5835.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| IN RE: M.S., A.S., and C.S. | : | APPEAL NOS. | C-250468 |
| | | | C-250487 |
| | : | TRIAL NO. | F/19/953 Z |
| | : | | |
| | : | *JUDGMENT ENTRY* | |

This cause was heard upon the appeals, the record, and the briefs.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed.

Further, the court holds that there were reasonable grounds for these appeals, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 12/31/2025 per order of the court.**

**By:**_____
        **Administrative Judge**

**[Cite as *In re M.S.*, 2025-Ohio-5835.]**

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| IN RE: M.S., A.S., and C.S. | : | APPEAL NOS. | C-250468 |
| | | | C-250487 |
| | : | TRIAL NO. | F/19/953 Z |
| | : | | |
| | : | *O P I N I O N* | |

Appeals From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: December 31, 2025

*Connie Pillich*, Hamilton County Prosecuting Attorney, and *Patsy A. Bradbury,* Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Klarysa J. Benge*, for Appellee Guardian Ad Litem,

*Kimberly V. Thomas*, for Appellant Mother,

*Cynthia S. Daugherty*, for Appellant Father.

**MOORE, Judge.**

{¶1}    Appellants N.S. ("Mother") and A.S. ("Father") appeal the juvenile court's order granting permanent custody of their children, M.S., A.S., and C.S., to the Hamilton County Department of Job and Family Services ("HCJFS"). Mother's first assignment of error asserts that the trial court committed reversible error by finding that HCJFS made reasonable efforts during the pendency of the case. Mother's second assignment of error and Father's sole assignment of error both assert that the juvenile court's decision to grant permanent custody to HCJFS was not supported by sufficient evidence and was contrary to the manifest weight of the evidence. Because competent and credible evidence supports the juvenile court's findings, the court's judgment is affirmed.

## I. Factual and Procedural History

{¶2}    HCJFS was granted interim custody of M.S., A.S., and C.S. on July 19, 2019, via a telephone ex parte emergency order after the children, Mother, and Father were found sleeping in a hospital waiting room. The agency filed a motion for an interim order for custody and a complaint for temporary custody of the children[1] on the same day. The motion for an interim order for custody alleged that the children were dependent and their condition or environment warranted the State's intervention, as described in R.C. 2151.04. The complaint for temporary custody stated that, on the date when the emergency order was granted, Mother, Father, and the children had reportedly been sleeping in the hospital waiting room for the previous four nights. The complaint alleged that, prior to this discovery, HCJFS had attempted

---

[1] This case also involves V.H., an older sibling who was placed separately and eventually was committed to the Planned Permanent Living Arrangement with HCJFS based on the parties' agreement that the placement was in V.H.'s best interest.

to contact the family after receiving a report that they were soliciting money on the streets, but the agency could not locate the family during that time. HCJFS also discovered that the family had been homeless since November 2018, had been staying with family members or "sleeping in various sites the past couple of months," and the children reported that they had not always been able to bathe or eat. The children were placed in HCJFS's interim custody on August 26, 2019.

### A. The Case Plan

{¶3} The case plan, filed on August 26, 2019, stated that Mother and Father were unable to provide the basic needs for their children as they were moving the "children from hotel to hotel, sometimes staying in their truck and parking lots." The case plan reflected that the parents did not understand the concerns for each child's cognitive delays and had not been consistent in obtaining services for them. It reported that the parents were having the children stand on corners to ask for money until they had enough money for the evening. The parents, therefore, were expected to obtain stable housing and income, submit to assessments through Family Access to Integrated Recovery ("FAIR"), follow diagnostic assessment of functioning ("DAF") recommendations, engage in meetings with the agency, and follow through with services and educational needs for the children.

### B. The Agency is Granted Temporary Custody of the Children

{¶4} Megan Shahan-Beck, the children's appointed guardian ad litem ("GAL"), supported placing the children in the temporary custody of HCJFS. The children were adjudicated dependent on October 16, 2019, and placed in the temporary custody of HCJFS on November 25, 2019. The magistrate found that reasonable efforts had been made, including case management, foster care placement of the children, DAFs, random drug screens, supervised visitation, vouchers,

4

transportation assistance, a Mayerson Center for Safe and Healthy Children ("Mayerson") interview, and individual therapy.

### C. The Agency is Granted its First Request for an Extension of Temporary Custody

{¶5} Paternal grandparents, who sought placement of the children but lived in Kentucky, underwent a home study pursuant to the Interstate Compact on the Placement of Children ("ICPC"). A June 22, 2020 entry reflected that the ICPC was denied due to lack of space and because HCJFS had substantiated the allegations that paternal grandfather had sexually abused M.S. and her sister V.H.

{¶6} HCJFS's motion to extend temporary custody, filed on May 13, 2020, was granted. The entry reflected that the children were making progress in their respective placements. At that point, Mother and Father had completed their DAFs. Mother was to complete a full-scale assessment, Father was to engage in individual therapy, and both parents were to engage in parenting classes. The parents were expected to complete their FAIR assessments and case-plan services in Hamilton County although they lived with paternal grandparents in Kentucky. The magistrate again made reasonable-efforts findings.

### D. The January 2020 Semiannual Report and Case-Plan Updates

{¶7} A January 2020 HCJFS Semiannual Administrative Review ("SAR") report reflected that Mother tested positive for "recent use of marijuana" "as well as cocaine . . . in the last 3 months." Father could not attend his initial drug screen due to "problems with his I.D." and did not appear for the rescheduled screening. The agency reported concerns with the parents' ability to parent their children as the caseworker witnessed them be "quick-to-anger" when the children misbehaved and "rely heavily" on the older children and agency staff to supervise the younger children. There were

also concerns with the parents' "general lack of understanding on how to care for their children," including diaper-changing practices as Mother was seen changing one child's diaper up to six times during a four-hour visit.

{¶8} A July 20, 2020 case-plan update reflected that the agency sought to update the court on the parents' completion of several assessments, that diagnoses and recommendations had been made, that there were "identified concerns in placement" although children had been in the agency's custody for nearly one year, and that M.S. had been moved to a new foster home.

{¶9} A July 22, 2020 entry reflected that the parents had been visiting with the children at the Family Nurturing Center ("FNC") and via video chat. Mother needed to complete a full psychological assessment and Father needed to engage in individual therapy. The entry noted that the parents had participated in parenting assessments, but it was uncertain that they were engaging in parenting classes. Father did not attend any of the scheduled four drug screens, and Mother's positive test for marijuana and cocaine was noted.

### E. Mother and Father Object to the August 2020 and September 2020 Case Plans

{¶10} Parents objected to the case plans filed on August 31, 2020, which reflected that the parents objected to M.S.'s foster mother's request to take M.S. on a trip. The parents also objected to the updated case plans that were filed on September 1, 2020, both stating that M.S. disclosed during her Mayerson interview that she and her brothers had been sexually abused by V.H. An expedited hearing on the parents' objection was scheduled for September 23, 2020.

{¶11} At the conclusion of the hearing, the magistrate found that M.S. had disclosed being sexually abused by V.H., who the magistrate noted was reportedly

6

"highly sexualized." The magistrate concluded that V.H.'s "behaviors put anyone who is in contact with her at risk" due to her constant absence without obtaining permission to leave ("AWOL") from her placement and sexual behavior while she is AWOL, and she believed that making V.H.'s visits with parents separate from the other three children was appropriate. The magistrate then approved the case plans.

### F. The Parents Failed to Complete Some Case-Plan Services

{¶12} An October 5, 2020 entry reflected that the children were doing well in their respective placements. While the entry stated that the parents had made "a lot of progress" by completing their DAFs, the agency requested that the parents complete follicle drug screens, be involved with the children's respective appointments, and provide proof of income. Mother had completed her assessments, so the agency wanted to refer her to developmental disability service ("DDS") due to her low cognitive functioning and "low educational abilities." HCJFS, however, reported concern with its ability to refer Mother to DDS or Father for therapeutic services because they continued to live in Kentucky.

### G. HCJFS's Motions to Extend Temporary Custody

{¶13} The agency filed a second extension for temporary custody on November 16, 2020. In its motion, HCJFS stated that the parents had completed parenting-education classes in September 2020 and visited regularly with the children in person or via video. The motion reflected that reunification of the children with the parents was possible provided that the parents obtained stable housing and income, showed that "they are capable of managing resources to ensure the children's needs will be met," completed substance-abuse treatment and submitted to drug screens, engaged in therapeutic services, and followed recommendations of service providers.

{¶14} A December 2020 SAR report stated that the parents were still living in

Kentucky and were not engaged in services. While Mother reported receiving social-security benefits and Father reported that he was working as a mobile mechanic and was paid "under the table," the parents had not provided proof of income. Neither parent had submitted to a drug screen over the previous months. The parents had permitted the paternal grandparents to pick A.S. and C.S. up from FNC, and paternal grandfather had attended a visit with M.S., despite the agency's decision to restrict paternal grandfather from being around the children. The parents reportedly refuted the substantiated claims that paternal grandfather sexually abused the children, despite the children's expression of fear of paternal grandfather.

{¶15} A December 15, 2020 entry granting HCJFS's second and final request for an extension of temporary custody reflected that the parents needed to attend random drug screens and meet with the children's care teams to understand and be able to meet the children's special needs. Father had yet to engage in individual therapy as recommended by his DAF and, while not recommended by Mother's DAF, the agency requested that Mother also engage in individual therapy. The entry noted a referral had been made to Talbert House to assist the parents with obtaining housing. A reasonable-efforts finding was made at this time.

### H.  The Parents Failed to Obtain Stable Housing and Income

{¶16} A January 29, 2021 entry reflected that Father still needed to engage in therapeutic services, and the parents needed to show that they had stable housing and income. The parents were "engaging in some services" with C.S. and A.S. through "TIP."[2]

---

[2] "TIP" is the acronym for Cincinnati Children's Hospital Medical Center's "Therapeutic Interagency Program" https://www.cincinnatichildrens.org/service/p/psychiatry/programs/outpatient/tip (accessed November 5, 2025) [https://perma.cc/U7ZN-4ZUH].

**{¶17}** A May 2021 SAR report reflected that the parents were looking for housing and had been engaged in their respective therapy services but still needed to provide proof of stable housing and income. Both parents tested positive for marijuana and cocaine in March 2021, and Father "described himself as a frequent marijuana smoker." The parents were no longer permitted to participate in the boys' TIP services "due to behavioral issues that started to come up." The report also reflected the GAL's concerns for the parents' ability to meet each child's special needs.

### I. HCJFS Moves to Modify Temporary Custody to Permanent Custody

**{¶18}** On June 17, 2021, HCJFS filed a motion for permanent custody of the children. The motion reflected the agency's concern that the parents' drug use affected their ability to obtain stable housing and income as they both had "tested positive for marijuana, cocaine, and benzoylecgonine."[3] The report reiterated that the parents refuted the substantiated allegations that paternal grandfather sexually abused the children or that the children suffered any trauma prior to being removed from the parents' care. The report stated that neither parent understood the children's special needs nor demonstrated an "increase in protective capacities" over the children.

**{¶19}** The trial on the permanent-custody motion was set for December 13, 2021.

### J. The Parents Continue to Struggle with Completing Case-Plan Services

**{¶20}** A June 23, 2021 entry reflected the agency's concerns that the parents had not obtained stable housing or income. Mother reportedly was working, but had not provided proof of income, and neither parent had submitted to further drug

---

[3] Benzoylecgonine is a metabolite of cocaine. https://pubchem.ncbi.nlm.nih.gov/compound/Benzoylecgonine (accessed November 5, 2025) [https://perma.cc/7YM4-GNBS].

screens since testing positive for marijuana and cocaine in March 2021. The GAL filed a report stating that she agreed with the children being placed in HCJFS's permanent custody. The magistrate made another reasonable-efforts finding.[4]

**{¶21}** According to a May 2022 SAR report, Mother reported that the parents were on the waiting list for Roll Hill Apartments. Mother reported that a person whom she "believed" was her therapist had been contacting her just to "check[] in with her," and that she was working nights. Father reported that the psychologist who was assigned to him through FAIR never contacted him. Father was reportedly encouraged to reach out to FAIR.

**{¶22}** A November 2022 case plan was filed to reflect that the agency had petitioned for permanent custody of the children.

### K. *Attorneys for Mother and Father Ask About Case-Plan Services*

**{¶23}** A May 30, 2023 entry[5] reflected that the newly-appointed attorneys[6] for Mother and Father asked whether there were case-plan services that the parents needed to complete. The caseworker responded that the parents needed to show that they have stable housing and income and submit to random drug screens. The caseworker stated new DAFs could be needed from the parents as what the agency had on file may have expired, and the agency would file an updated case plan.

**{¶24}** A July 2023 SAR report stated that the parents minimized the disclosures of sexual-abuse allegations, had provided various unverifiable, unsuitable,

---

[4] Of note, although the magistrate's prior reasonable-efforts findings made on April 6, 2023, regarded V.H., the findings did address the services that had been offered to Mother (Father in this matter is not V.H.'s alleged father).

[5] There are gaps in the procedural posture between June 2021 and May 2023 where it regards V.H., who is not the subject of this appeal.

[6] The matter was continued several times due to change of counsel; Father was appointed new counsel twice, and Mother was appointed a GAL (who did not file a brief in this appeal) then appointed new counsel in April 2023.

or nonexistent addresses as their residence, and had not completed updated DAFs or met with the caseworker. The report reflected that the parents completed an updated release of information, but the agency could not make a referral for drug screens as correct boxes were not checked. While the parents were noted to have previously attended some medical appointments, they had not attended the children's medical appointments during this report's "review period" despite being provided with the information.

{¶25} An August 23, 2023 entry reflected that an updated case plan was filed on July 28, 2023. Because it did not contain an amendment sheet detailing the status of any referrals or whether the parents had engaged in those services, the magistrate ordered HCJFS to file an updated case plan with the amendment and, prior to the September 21, 2023, pretrial hearing, file a written report outlining the dates the caseworker met with parents, services that the parents were expected to complete, a list of referrals that had been made for the parents past and present, the status of the parents' engagement in those services, and the status of drug screens the parents had undergone and their visitation with the children.

{¶26} The magistrate's September 21, 2023 entry reflected that HCJFS had not complied with the court's orders regarding the updated case plan and written report. The entry stated that counsel for HCJFS reported that she had received a written report from the agency the previous week, but it had not been filed "due to issues in her office," and had not been sent to each parent's counsel "due to issues with the releases." The matter was continued for a pretrial so the updated case plan and written report could be filed. The magistrate ordered that an HCJFS supervisor be present at the next hearing, or the section chief if the supervisor was not available.

{¶27} The updated case plan and written report was filed according to the

magistrate's order that day. HCJFS filed three more written reports on October 5, 2023, October 13, 2023, and October 31, 2023. While, at that point, Mother had provided a copy of the lease for a home that the parents were renting in Winton Terrace, the parents still needed to complete a new DAF, submit to drug screens, provide proof of income, attend the children's medical appointments, and demonstrate knowledge and understanding of their children's needs. Father had been discharged from FAIR due to lack of attendance since September 2021.

{¶28} A November 6, 2023 entry following a pretrial hearing acknowledged the filing of the updated case plan and written reports. The caseworker reported that the parents had secured housing and she met with the parents at the residence. The parents had been visiting the children regularly, but they had yet to complete updated DAFs, submit to drug screens, or show proof of verifiable income and employment. The GAL also had requested to be appointed the children's educational decision maker, which was granted on November 16, 2023.

### L. *The Trial on the Motion for Permanent Custody*

{¶29} The trial on the agency's permanent-custody motion was continued numerous times for various reasons between November 2021 and April 2023, including scheduling conflicts, the withdrawals and new appointments of counsel for either Mother, Father, or sibling V.H.,[7] and the parents' objection to the initial denial of a permanent placement living arrangement for V.H. The trial on the permanent-custody motion was eventually rescheduled for February 5-6, 2024. The GAL filed a report on February 12, 2024, reflecting that she supported the permanent-custody

---

[7] V.H. was appointed an *In re Williams* attorney to advocate for her interests at one point. However, that appointment was withdrawn once V.H. was committed to a planned permanent living arrangement in April 2023—prior the trial on the agency's permanent-custody motion.

motion.

{¶30} The trial proceeded as scheduled and continued in progress over three days, ending on April 11, 2024. The parents did not testify.

*1. Holly Krismanick's Testimony*

{¶31} Holly Krismanick, an outpatient mental-health therapist with Central Clinic Behavioral Health, had been M.S.'s therapist since September 2020. Krismanick testified that M.S. had been diagnosed with ADHD, PTSD, fetal alcohol syndrome, and cognitive delays, and she sees M.S. biweekly. She explained that, when she first started seeing M.S., M.S. was engaged in occupational therapy, speech therapy, equine therapy, and applied behavioral services ("ABS") behavioral therapy. M.S. had since transitioned out of ABS therapy. Krismanick testified that she works with M.S. on processing her trauma, developing social skills, and helping her with her developmental disabilities.

{¶32} Krismanick explained that M.S. has an IQ of 50 so she also helps M.S. with reading, and that M.S. needs a lot of academic support. Krismanick testified that M.S. disclosed that she had been sexually abused by her sister, V.H., and "a grandfather." Krismanick further testified that M.S. has expressed fear of V.H. and struggles with nightmares, and M.S. recently reported having nightmares for a couple of weeks after a visit with her parents. Krismanick explained that she would engage M.S. in art and "play therapy" to help her address the nightmares, and that she helped M.S. develop a safe word for visits without fear of contact with V.H.

{¶33} Krismanick testified that M.S. never communicated that she desired to return home to her parents. She stated that M.S. likes where she lives and feels supported by her foster mother. M.S. reportedly visits with her brothers, A.S. and C.S., outside their FNC visits. Krismanick explained that M.S. is aware of adoption and what

13

it means, but she has not addressed permanent custody with M.S. because she did not want to cause M.S. anxiety. Krismanick reported that M.S. is making progress because she needed a lot more support when she first began therapy than she did at that point.

### 2. Ben Gawin's Testimony

**{¶34}** FNC facilitator, Ben Gawin, testified that he facilitated visits for parents with V.H., M.S., A.S., and C.S. for two years until four months before the trial. He stated that V.H.'s visits were separate from M.S., A.S., and C.S. Gawin testified that the parents did not bring visitors with them to the visits and acknowledged that paternal grandfather was not approved to visit the children.

**{¶35}** Gawin explained that Mother and Father were expected to visit consistently and reduce the time that the children spent on electronic devices during visits. Gawin testified that C.S. and A.S. would run to their parents and hug them at the beginning of visits. He explained that, for a while, M.S. was uncomfortable during visits and would use a code word if she felt uneasy, which happened once or twice. Gawin stated that he never heard the children discuss where they wanted to live while he was supervising visits.

### 3. A.S.'s and C.S.'s Foster Parents' Testimonies

**{¶36}** K.H. and L.H. had been the foster parents for A.S. and C.S. since November 2019, when A.S. was three years old, and C.S. was two years old. There is one other child in their home whom the boys call their sister.

**{¶37}** K.H. testified that, when HCJFS initially placed A.S. and C.S. in their home, the boys had "a lot of night terrors." K.H. explained that the boys were dysregulated as they were very impulsive and required intense supervision. Both boys were below the growth curve. A.S. could only give one-word responses–he would say, "bugs," and A.S. had an irrational fear of bugs. C.S. was not talking and could only

make "sounds." K.H. explained that boys would eat so much and so fast at mealtimes that they would become physically ill. She added that C.S. would "become very distressed" if they touched the food on his plate. K.H. reported that both boys attend school, and they both have individualized education plans ("IEP") and special services in place at school.

{¶38} K.H. explained that A.S. has been diagnosed with severe ADHD, lateral lisp, and seizures because of a traumatic brain injury. K.H. and L.H. both explained that A.S. has low stature, keloid scars on his face, chest, and arms from a burn incident, a weak core, and low cognitive functioning. A.S. wears compression garments, which are adjusted regularly at Nationwide Children's Hospital in Columbus. A.S. receives occupational and speech therapy at school and receives mental-health services biweekly and receives tutoring at home.

{¶39} K.H. and L.H. reported that C.S. has ADHD, aggression, reactive disorder, sensory-processing disorder, expressive-speech disorder, sleep apnea, night terrors, periodic-limb-movement disorder, and suspected fetal alcohol syndrome. She explained that C.S. attends occupational therapy, speech therapy, and mental-health services on an outpatient basis weekly and at school. K.H. stated that she and L.H. have attended parenting classes to help C.S. with his various therapies, and they use "visual schedules" in the home.

{¶40} K.H. testified that the parents' interactions with the children were alarming as they were unable to understand the children's developmental delays and medical and emotional needs. K.H. recalled that the parents had previously asked her and L.H. to bring food to the visits, and the parents have reported living at multiple addresses while the case was pending.

{¶41} K.H. testified that the parents had not attended many of the boys'

15

appointments, did not understand the strategies needed to manage the boys' behaviors, and did not understand the severity of their trauma or diagnoses. K.H. recalled that the parents gave the boys scooters that were not developmentally appropriate.

{¶42} L.H. testified that parents had been informed of the boys' appointments and IEP meetings. L.H. recalled when paternal grandfather approached him at FNC one time after a visit. L.H. also recalled the parents bringing the boys toys that were not appropriate for their level of cognitive functioning. L.H. stated that the boys were not yet toilet trained when they came to live with him, and K.H. and explained the boys' food insecurities.

{¶43} L.H. testified that the parents initially reported living on Decoursey with the paternal grandparents until there was a housefire in 2022. L.H. stated that the parents later told him that they had bought a home on Halsey Avenue in Sedamsville for $1,000, but L.H. drove by the house and it was all boarded up. L.H. also recalled that another address given by the parents was a wooded hill.

### 4. M.S.'s Foster Mother's Testimony

{¶44} M.S.'s foster mother, S.B., testified that HCJFS placed M.S. in her home in May 2020 when M.S. was 9 years old. S.B. explained that M.S. was functioning as a two- to three-year-old when she first came to S.B.'s home; she could not brush her teeth, wipe her bottom after toileting, or bathe herself. S.B. testified that M.S. called her armpits "apartments." M.S. did not know the alphabet. M.S. had not been "exposed to the community" and had to wear noise-cancelling headphones in public. S.B. testified that M.S. has been diagnosed with reactive-attachment disorder, intellectual disability, PTSD, and fetal alcohol syndrome.

{¶45} M.S. was 13 years old at the time of trial. S.B. reported that M.S. was

functioning as a six-year-old at that point, and she needed reminders and help with hygiene. S.B. testified that M.S. was in a multiple-disability classroom, has an IEP, and was doing kindergarten-level schoolwork. M.S. had learned the alphabet, but she could not read or write. S.B. reported that M.S. had been on the A-B honor roll for the previous two years and had received awards at school for being a good friend, wearing her uniform, and punctuality. S.B. testified that M.S. attended speech, occupational, trauma, and equine therapy weekly, and will need services long-term into her adulthood.

**{¶46}** S.B. has two other children in the home and she reported that all three children get along well.

**{¶47}** S.B. testified that she kept the parents informed about M.S.'s appointments through the caseworker. S.B. stated that she used to talk to M.S.'s parents about M.S.'s diagnoses, therapy, and extracurricular activities but they did not seem to understand M.S.'s diagnosis or need for services. S.B. also testified that the parents attended one IEP meeting.

**{¶48}** S.B. stated that she would sometimes ride the elevator to the FNC visits with M.S. and the parents, and M.S. would hide behind her. S.B. recalled that M.S. had used her safe word a couple of times during visits. She reported that M.S. had chosen not to visit two times in the previous couple of months, and M.S. had nightmares after a visit when Mother forced her to interact with V.H. via Facetime during an FNC visit and told M.S. to be quiet.

**{¶49}** S.B. testified that M.S.'s parents asked her for money and food in January 2024, and they have asked her for money for a car part. She testified that, over the course of the case, Mother and Father said that they were living in a car or different hotels, and they had been living in a house, but they had to move due to a

fire. S.B. recalled Father telling her that he works as a mobile mechanic and is paid "under the table." Mother told her that she had worked at fast-food restaurants.

### 5. *The Guardian Ad Litem's Testimony*

**{¶50}** The GAL testified that the juvenile court appointed her as the GAL for M.S., A.S., and C.S. in August 2019. She testified that she continues to support the permanent-custody motion. The GAL reported that the children were comfortable and bonded to their caregivers and the other children in their respective foster homes, and they were making progress in their respective services.

**{¶51}** The GAL testified that M.S. has consistently reported that she wished to live with her foster mother, and M.S. can give more details regarding her wishes now that she is older. The GAL testified that M.S. reported just the day prior that she wanted to stay at her foster mother's house and have some communication with her parents. The GAL testified that A.S. and C.S. have told her that they do not want to live or sleep with "Mommy and Daddy from the tall building," which is how they refer to their biological parents and FNC, and they wanted to live and sleep with "the parents that don't live in the tall building," which are their foster parents.

**{¶52}** The GAL recalled that the parents were initially involved when A.S. and C.S. participated in "TIP." She stated that, since the children have been in school, the parents attended one or two IEP meetings for M.S., one IEP meeting for A.S., and no IEP meetings for C.S. The GAL explained the parents understand that the children "have something atypical" and are on IEPs, but they do not understand the specifics and all the children's services. The GAL explained that she became the primary educational decision maker to get additional services in place at school for C.S. The GAL reported she worked with legal aid for six months to get additional support and a resource room for C.S. at school, and the parents did not participate in that process

despite being notified by the school.

{¶53} The GAL testified that the parents have reported living in a car, in a home on Decoursey Avenue with the children's grandparents, which burned down, a boarded-up home that had been foreclosed on, a plot of trees in the woods, and a hotel. She acknowledged that the parents had obtained housing in Winton Terrace, but she did not know how long they had lived there. The GAL testified that she supports HCJFS's permanent-custody petition because the parents had yet to make progress "since the case opened."

### 6. *The HCJFS Caseworker's Testimony*

{¶54} The HCJFS caseworker, Erica Binford, testified that HCJFS became involved with the family in July 2019 when they had been staying at Mercy West's hospital waiting room. Binford stated that she had been the ongoing caseworker for the family since March 2022. She explained that, since she has had case responsibility, no relatives have come forward seeking custody or placement of the children.

{¶55} Binford expressed that the agency had continuing concerns about the parents' ability to provide long-term care and stability for M.S., A.S., and C.S. Binford testified that, while Mother reported employment at various fast-food restaurants and Father reported employment as a mobile mechanic, neither provided her with verification of income. She reported that Mother completed an updated DAF on January 29, 2024—just days before the permanent custody trial—but the agency did not have an updated DAF from Father.

{¶56} Binford explained that she had asked the parents to complete random drug screens and referred them for a random screen in September 2023. She stated that the parents agreed to meet at the drug-testing facility, but neither parent appeared. Binford recalled that Father said that he did not have an identification card,

19

which was a barrier to completing the screen. Binford testified that afterward she submitted a "blanket referral" for drug screens so that the parents could go on any day they were available to submit a drug screen, but the parents never got the screens done. Binford stated that she had not received any drug-screen results since she became the ongoing caseworker.

{¶57} Binford additionally testified that M.S. disclosed sexual abuse by her older sister, V.H., and a paternal grandfather. Binford reported that the parents told her in 2023 that they planned to have V.H. and the paternal grandfather live with them when they obtained housing. Binford testified that the parents minimized their substance-abuse issues and did not seem to understand the children's special needs.

{¶58} Binford stated that the parents visit the children weekly at FNC. She recalled the incident where Mother FaceTimed V.H. while visiting with M.S., and M.S. asked Mother to end the FaceTime calls with V.H. but Mother refused to do so, which upset M.S. Binford testified that she reached out via email to Mother and Father regarding the matter but received no response, and she also went to a visit but could not talk to the parents while the children were present.

{¶59} Binford testified that the agency provided the parents with information about the children's respective appointments via email and she would receive responses from Mother.

{¶60} Binford testified that the parents obtained housing in Cincinnati at the end of October 2023, which she visited on October 27. Binford recalled that the parents presented a lease that was effective as of October 2023. Binford reported that the home had four bedrooms, the main bedroom was furnished, and there may have been a bed in another bedroom, but there was no other furniture in the home. Binford testified that the parents told her that they planned to put V.H. in one bedroom, M.S.

in another, and C.S. and A.S. together in a bedroom. Binford testified that Mother told her that the parents planned to move paternal grandfather into the home once he was released from "some facility," which caused her concern due to the sexual allegations against the grandfather. Binford recalled that when she returned to visit the home again in February 2024, she heard noises coming from inside and saw the parents' vehicle in the driveway, but no one answered the door.

**{¶61}** Binford testified that the children are bonded to their respective foster families, and their respective foster families wish to adopt them.

### M.  HCJFS's Motion for Permanent Custody is Granted

**{¶62}** As explained in more detail below, the magistrate found by clear and convincing evidence that permanent custody to HCJFS was in the children's best interest because they had been in the agency's custody for approximately 20 consecutive months when the permanent-custody motion was filed under R.C. 2151.414(B)(1)(d), and based on applicable factors contained in R.C. 2151.414(D)(1)(a)-(e). Although the magistrate was not required to make reasonable-efforts findings at the trial, her entry states that reasonable efforts included DAFs and updated DAFs for each parent, random drug screens, visitation, case management, foster-care placement, and therapeutic services for the children.

### N.  Mother and Father File Objections

**{¶63}** Both parents timely filed objections, arguing that the magistrate's decision was not supported by sufficient evidence and was against the manifest weight of the evidence.

### O.  The Juvenile Court's Entry

**{¶64}** After independently reviewing the record, the juvenile court overruled the parents' respective objections and adopted the magistrate's decision. The juvenile

court considered the best-interest factors under R.C. 2151.414(D)(1)(a)-(e). The court found that the children had been in their respective placements for four years, and that their respective medical, therapeutic, and emotional needs were being met. The entry reflected that the children were bonded to their respective foster families. The court's entry stated that, "Despite the children being removed from [the parents'] custody for homelessness in 2019, the parents did not obtain housing until October 2023. . . ." The court noted that the parents visited the children weekly, but failed to attend IEP meetings or appointments, there was no furniture for the children in the home, the parents had not demonstrated their sobriety, and they had not provided HCJFS with proof of income. The court further noted that no family members had sought placement or custody of the children since Binford assumed case responsibility.

{¶65}  Under R.C. 2151.414(D)(1)(b), the court found that the children each have limited functioning and noted the GAL's report that each child reported wanting to live with their foster parents, not "their biological parents."

{¶66}  Under (D)(1)(c), the juvenile court found that the children have been in the temporary custody of HCJFS for 12 or more months of a consecutive 22-month period, and the children had been in the agency's custody for 18 months[8] when the permanent-custody motion was filed.

{¶67}  Under (D)(1)(d), the juvenile court reiterated each child's special needs and engagement in "multiple services to address their needs." The court acknowledged the parents' love for their children but stated that they did not understand or acknowledge the children's trauma or their unique needs.  The court reiterated the

---

[8] The magistrate's and juvenile court's findings differ regarding how long the children had been in the agency's temporary custody when the permanent-custody motion was filed but, while we calculate that the children were in temporary custody for 19 months, neither calculation impacts the outcome of this case as the children were in custody for the requisite 12-of-22 consecutive months at the time of the filing. *See* R.C. 2151.413(D)(1) and 2151.414(B)(1)(d).

parents' failure to engage in case-plan services or to demonstrate stable housing and income or sobriety, and that their visitation never progressed from supervised. The court concluded the parents could not provide a permanent placement to meet the children's needs.

{¶68} The juvenile court found that, pursuant to R.C. 2151.414(D)(1)(e), none of the factors in R.C. 2151.414(E)(7)-(11) applied. Based on the foregoing, the juvenile court found that the grant of the permanent-custody motion was in the children's best interest.

{¶69} This appeal followed.

## II.  Analysis

### A.  Reasonable Efforts

{¶70} In her first assignment of error, Mother asserts that the juvenile court failed to make reasonable-efforts findings prior to HCJFS filing for permanent custody of the children where the most recent probable-cause finding was made in June 2021 and HCJFS filed its permanent-custody motion in June 2021. Mother failed to raise this issue in her objections, and she does not advance a plain-error argument. *See In re J.W.*, 2019-Ohio-2730, ¶ 7 (1st Dist.); Juv.R. 40(D)(3)(b)(iv) ("Except for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion . . . unless the party has objected to that finding or conclusion. . . ."). This court, therefore, declines to address this assignment of error.

### B.  Sufficiency and Manifest Weight

{¶71} Mother's second assignment of error and Father's sole assignment of error are addressed together as they both argue that the record does not support the grant of permanent custody to HCJFS by clear and convincing evidence, and that the juvenile court's judgment is not supported by sufficient evidence and is contrary to the

manifest weight of the evidence.

### 1. *Standard of Review*

**{¶72}** In order to terminate parental rights and grant permanent custody to the agency, R.C. 2151.414(B)(1) requires that the court determine at the hearing by clear and convincing evidence that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any conditions listed in R.C. 2151.414(B)(1)(a)-(e) apply. *In re N.M.P.,* 2020-Ohio-1458 ¶ 15. In determining the best interest of a child, the juvenile court must consider relevant factors included in the nonexhaustive list set forth in R.C. 2151.414(D)(1). *See In re B.H.*, 2024-Ohio-423, ¶ 37 (1st Dist.); R.C. 2151.414(B)(1).

**{¶73}** Clear and convincing evidence is sufficient evidence to "produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *In re B.H.* at ¶ 35, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. When applying a clear-and-convincing standard, this court will not substitute its judgment where ample competent and credible evidence supports the trial court's judgment. *Id.*

**{¶74}** In reviewing a juvenile court's decision to terminate parental rights under R.C. 2151.414, this court applies a sufficiency-of-the-evidence or a manifest-weight-of-the-evidence standard of review, or both, depending on the nature of the arguments raised. *In re Z.C.*, 2023-Ohio-4703, ¶ 11. "Sufficiency of the evidence and manifest weight of the evidence are distinct concepts[.]" *Id.* at ¶ 13. As the parents raise challenges to both the sufficiency and weight of the evidence, we address each argument applying the appropriate standard of review.

**{¶75}** When reviewing a challenge to the sufficiency of the evidence, the role of this court is to independently review the evidence to determine if the juvenile court's

decision is supported by clear and convincing evidence. *In re S.D.*, 2020-Ohio-3379, ¶ 12 (1st Dist.). To determine whether sufficient evidence supported a judgment terminating parental rights, we must determine whether some evidence exists on each element. *In re B.H.*, 2024-Ohio-423, at ¶ 36 (1st Dist.). It is a test for adequacy which contemplates the burden of production and is a question of law which we review de novo. *See In re A.B.*, 2015-Ohio-3247, ¶ 15 (1st Dist.).

**{¶76}** A manifest-weight challenge regards the burden of persuasion. *Id.* at ¶ 15. A weight-of-the-evidence review in permanent-custody cases requires us to weigh the evidence and all reasonable inferences and consider the credibility of the witnesses. *In re B.H.* at ¶ 36. In resolving conflicts in the evidence, we must determine whether the juvenile court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. *Id.*

### 2. *The Juvenile Court Did Not Err by Granting HCJFS's Motion for Permanent Custody*

**{¶77}** Clear and convincing evidence demonstrated that R.C. 2151.414(B)(1)(d) applied because the children had been in HCJFS's temporary custody for 12 or more months of a consecutive 22-month period. Having demonstrated at least one of the conditions under R.C. 2151.414(B)(1) has been met, this court must review R.C. 2151.414(D)(1)(a)-(e) to determine whether the juvenile court properly determined that permanent custody was in the children's best interest. As discussed in detail below, we conclude that it did.

### a. The Best-Interest Factors Under R.C. 2151.414(D)

**{¶78}** The factors in R.C. 2151.414(D) include (1) the child's interaction and interrelationship with the child's parents, relatives, foster parents, and other persons who may significantly affect the child; (2) the child's wishes, either expressed by the

child or through a GAL; (3) the child's custodial history, *including* whether the child has been in an agency's custody for 12 or more months of a consecutive 22-month period; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without granting the agency permanent custody; and (5) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable. *In re B.H.*, 2024-Ohio-423, at ¶ 38 (1st Dist.). Here, R.C. 2151.414(D)(1)(a)-(d) apply.

*The Children's Wishes*

**{¶79}** The record supports the juvenile court's finding that permanent custody is in the children's best interest under R.C. 2151.414(D)(1)(a)-(d). While acknowledging the parents' love for their children and consistency in visiting with the children, the court also considered that the children were bonded to their respective foster families, and each of their prognoses had been improving and the children were thriving in their respective foster families' care. *See* R.C. 2151.414(D)(1)(a). M.S. consistently expressed her wishes to remain with her foster mother, A.S. and C.S. expressed their wishes—as best they could—to sleep in the home where their foster parents lived, and the GAL supported permanent custody. *See* R.C. 2151.414(D)(1)(b).

*Custodial History*

**{¶80}** The children were placed in HCJFS's temporary custody on November 25, 2019. By the time HCJFS filed its motion for permanent custody on June 17, 2021, they had been in the agency's temporary custody for over 12 months of a 22 consecutive-month period. *See* R.C. 2151.414(D)(1)(c).

*The Children's Need for a Legally-Secure Placement*

**{¶81}** The record shows that the parents did not timely obtain stable housing, failed to provide proof of income or submit to drug screens, refuted the reported sexual abuse perpetrated against the children, and generally did not understand the

children's needs or demonstrate an ability to protect them. *See* R.C. 2151.414(D)(1)(d).

*Other Factors*

**{¶82}** R.C. 2151.4141(D)(1)(e) provides that a court shall next consider whether "any of the factors in [R.C. 2151.414(E)(7)-(11)] apply in relation to the parents and child." The juvenile court found that none of these factors applied.

**{¶83}** The court also considered R.C. 2151.414(E)(16), which provides that a juvenile court can consider "[a]ny other factor the court considers relevant," and found that no family members came forward seeking placement or custody of the children since HCJFS caseworker Erica Binford took over case responsibility. *See* R.C. 2151.414(D)(2)(d) ("Prior to the dispositional hearing, no relative or other interested person has filed, or has been identified in, a motion for legal custody of the child.").

### III.  Conclusion

**{¶84}** While HCJFS delayed filing the updated case plan in September 2023, numerous case plans were filed before HCJFS filed its permanent-custody motion. Further, the agency eventually complied with the court's August 23, 2023 and September 21, 2023 orders; the agency's expectations of the parents not only remained the same, but issues regarding proof of income, attendance at the children's medical appointments, and submitting to drug screens largely remained unaddressed.

**{¶85}** Clear and convincing evidence, therefore, supports the juvenile court's conclusion that committing the children to HCJFS's permanent custody was in the children's best interest. The evidence was sufficient to show that the parents failed to engage in case-plan services outside of visiting the children. The parents did not testify, so the only testimony the juvenile court could consider was that of the agency's witnesses. The juvenile court was in the best position to determine the credibility of the witnesses. *In re J.G.*, 2024-Ohio-2423, ¶ 22 (1st Dist.). Nothing in the record

suggests that the court lost its way and created such a manifest miscarriage of justice to require reversal. Accordingly, Mother's second assignment of error and Father's sole assignment of error are overruled.

{¶86}  For the foregoing reasons, we affirm the trial court's judgment.

Judgment affirmed.

**KINSLEY, P.J.,** and **CROUSE, J.,** concur.